### In re Maryesther S. MERLO, Magisterial District Judge, Magisterial District 31–1–02, Lehigh County.

Court of Judicial Discipline of Pennsylvania.

Aug. 29, 2011.
Order Oct. 17, 2011.

strued strictly.

Before MORRIS, P.J., JUDGE, SR., KURTZ, JAMES, CURRAN, McGINLEY, and CLEMENT, JR., JJ.

## ORDER

PER CURIAM.

AND NOW, this 29th day of August, 2011, based upon the Opinion filed herewith, it is hereby ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law is hereby filed, and shall be served upon the Judicial Conduct Board and the Respondent,

That either party may elect to file written objections to the findings and conclusions of the Court, stating therein the basis for those objections, provided that such objections shall be filed with the Court within ten (10) days of the date of entry of this Order, and a copy thereof served upon the opposing party,

That, in the event that such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and, if so, issue an Order setting a date for such oral argument. If the Court determines not to entertain oral argument upon the objections, the Finding of Fact and Conclusions of Law shall become final and this Court will conduct a hearing on the issue of sanctions,

That, in the event objections are not filed within the time set forth above, the Findings of Fact and Conclusions of Law shall become final, and this Court will issue an Order setting a date, pursuant to C.J.D.R.P. No. 504, for a hearing on the issue of sanctions.

OPINION BY President Judge MORRIS.

## I. *INTRODUCTION*

The Judicial Conduct Board (Board) filed a Complaint on November 4, 2010 with this Court against Magisterial District Judge Maryesther Merlo, Magisterial District Judge for Magisterial District 31-1-02 of the Thirty-first Judicial District, Lehigh County, Pennsylvania (Respondent) consisting of seven Counts which charge Respondent as follows:

1. Failing to respect and comply with the law and failing to conduct herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary, a violation of Rule 2A. of the Rules Governing Standards of Conduct of Magisterial District Judges (Count 1).

2. Failing to devote the time necessary for the prompt and proper disposition of the business of her office, which shall be given priority over any other occupation, business, profession, pursuit or activity, a violation of Rule 3A. of the Rules Governing Standards of Conduct of Magisterial District Judges (Count 2).

3. Failing to be faithful to the law and failing to maintain competence in it, a violation of Rule 4A. of the Rules Governing Standards of Conduct of Magisterial District Judges (Count 3).

4. Failing to be patient, dignified, and courteous to litigants, witnesses, lawyers and others with whom they deal in their official capacity, and shall require similar conduct of lawyers, of their staff and others subject to their direction and control, a violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges (Count 4).

5. Failing to diligently discharge her administrative responsibilities, failing to maintain competence in judicial administration and failing to facilitate the performance of the administrative responsibilities of her staff and of other members of the judiciary and court officials, a violation of Rule 5A. of the Rules Governing Standards of Conduct of Magisterial District Judges (Count 5).

6. Conduct which brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution (Count 6).

7. Neglect or failure to perform the duties of office, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution (Count 7).

The Complaint includes extensive factual allegations in support of the seven Counts.

Acting pursuant to C.J.D.R.P. No. 501, the President Judge appointed a Panel consisting of Conference Judge Morris, Judge James and Judge McGinley.

On February 25, 2011 the Board filed a second Complaint, containing three new sets of factual allegations relating to the categorical violations alleged in the first Complaint.

By order of March 7, 2011, the two Complaints were consolidated for purposes of pre-trial conferencing and trial.

Trial was held on May 31 to June 2, 2011.

As we make our findings of fact, we will discuss the efficacy of those facts in establishing the violations of the canons and of the constitution asserted by the Board and set out in the seven Counts recited above.

Before doing so, we set down fundamental principles which direct us in our work.

The constitutional amendment of 1993 establishing this Court provided certain specific instructions for the conduct of proceedings before this Court:

All hearings conducted by the court shall be public proceedings conducted pursuant to the rules adopted by the court and in accordance with the principles of due process and the law of evidence. Parties appearing before the court shall have a right to discovery pursuant to the rules adopted by the court and shall have the right to subpoena witnesses and to compel the production of documents, books, accounts and other records as relevant. The subject of the charges shall be presumed innocent in any proceeding before the court, and the board shall have the burden of proving the charges by clear and convincing evidence.

Pa. Const. Art. V, § 18(b)(5).

The Pennsylvania Supreme Court has defined clear and convincing evidence as follows:

The witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. . . . It is not necessary that the evidence be uncontradicted provided it "carries a clear conviction to the mind" or "carries a clear conviction of its truth."

*In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 886 (1986). *See, also, LaRocca's Trust,* 411 Pa. 633, 640, 192 A.2d 409, 413 (1963).

 Since the Constitution requires that "all actions of the court . . . shall require approval by a majority vote of the members of the court" (Pa. Const. Art. V, § 18(b)(4)) the Panel's Findings of Fact have been reviewed and this Decision is rendered by the full Court. Mindful of the reality, long jurisprudentially recognized, that assessments of credibility are best made by one who hears the witnesses testify and observes their demeanor, the Court is obliged to accord special deference to the Panel's Findings of Fact. The Supreme Court of Pennsylvania has addressed the subject as follows:

As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as fact finder, we are precluded from overturning that finding and must affirm,

thereby paying the proper deference due to the fact finder who heard the witnesses testify and was in the sole position to observe the demeanor of the witnesses and assess their credibility. This rule of law is well established in our jurisprudence and is rooted in concepts of fairness, common sense and judicial economy. (citations omitted).

*Commonwealth Dept. of Transportation v. O'Connell,* 521 Pa. 242, 248, 555 A.2d 873, 875 (1989). See, also, the observations of the United States Supreme Court in *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), "... the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled ... to 'special deference' ", and in *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 500, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), "The requirement that special deference be given to a trial judge's credibility determinations is itself a recognition of the broader proposition that the presumption of correctness that attaches to factual findings is stronger in some cases than in others." We also determine that in the portions of this case where Respondent's demeanor is called into question the presumption should be stronger rather than weaker because, in those instances, credibility determinations were pivotal.

Although the two Complaints are set out in terms of the rules and constitutional provisions which were allegedly violated, the case is best considered in terms as it was presented, namely by review of the categories of conduct giving rise to the alleged formal violations. In general terms, those categories are:

A. Work Habits
B. Truancy Cases
C. Landlord/Tenant Cases
D. Demeanor and Abuse of Power
 1. *Commonwealth v. Steinbrecher*
 2. *Commonwealth v. Mercado*
 3. *Commonwealth v. Parrales*
 4. Zampogna
 5. *Commonwealth v. Berrios*
 6. *Commonwealth v. Krauss*
 7. *Alcaro v. DeCesare*
 8. *Commonwealth v. Rozak*
 9. *Commonwealth v. Renninger*
 10. *Commonwealth v. Alvarez*
 11. Office Staff
 a. Stringer
 b. Nonnemacher

The evidence consists of pre-trial stipulations submitted and accepted pursuant to C.J.D.R.P. No. 502(D)(2), stipulated exhibits at trial pertaining primarily to attendance and docketing, 22 fact witnesses called by the Board, five fact witnesses (including herself) called by the Respondent, seven character witnesses called by the Respondent, and various exhibits admitted at trial.

## II. FINDINGS OF FACT AND DISCUSSION

The Court now makes its findings of fact; those which are stipulated are so designated.

### INTRODUCTORY

1. Pursuant to Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania, the Board is granted authority to determine whether there is probable cause to file formal charges, and, when it concludes that probable cause exists, to file formal charges, against a justice, judge, or magisterial district judge, for proscribed conduct and to present the case in support of such charges before the Court of Judicial Discipline. (Stipulated).

2. Since on or about 2004, Respondent has served continuously to the present as the duly-elected Magisterial District Judge of Magisterial District 31–1–02 of the Thirty-first Judicial District, Lehigh County, Pennsylvania, encompassing the City of Allentown and Wards 4, 7 and 11. (Stipulated).

3. The Respondent is not addicted to alcohol or drugs. (Stipulated).

4. The Respondent is not mentally impaired from performing the duties of her judicial office. (Stipulated).

## A. *WORK HABITS*

### *Findings of Fact*

5. William Henry Platt presently serves as a judge on the Superior Court of Pennsylvania. He served as President Judge of Lehigh County from 2002 through 2007 and from 2008 until his retirement in 2010. As president judge he had supervisory authority over the magisterial district judges in Lehigh County. This included the responsibility of assuring that the 14 magisterial district judges in Lehigh County operated their courts and offices efficiently and conducted their business in accordance with the law and the rules applicable to magisterial district judges promulgated by Lehigh County and the Commonwealth of Pennsylvania. (N.T. 29–30, 49 Platt).

6. H. Gordon Roberts has been employed as the Magisterial District Court Administrator for Lehigh County for the last 20 years. His duties include overseeing all the persons employed in the magisterial district courts, as well as purchasing, leasing, and dealing with other governmental agencies. He has known Respondent since she first took office in 2004. (N.T. 464 Roberts).

7. Rebecca Wenhold has been the officer manager of Respondent's court since March 2009 to the present. She has worked for four other magisterial district judges in Lehigh County over the last 12 years. It was her job to schedule hearings, answer the telephone, process payments, issue warrants, arrange for coverage, and she had the overall supervision of the operation of the court and the other employees. (N.T. 66–68 Wenhold).

8. "Coverage" in the Lehigh County magisterial district courts means that whenever a magisterial district judge is going to be out of the office for a day, or for a number of days less than 30, her office must find another Lehigh County magisterial district judge to handle time sensitive matters such as signing warrants or conducting arraignments that come to the absent judge's court. That is all the "covering" that is provided. In cases where a magisterial district judge will be absent for more than 30 days, request for a senior judge is made to the president judge. In those cases, the senior judge is responsible to conduct all the business of the court. (N.T. 493–94 Roberts; 539–41 Butler).

9. Deborah Stringer preceded Rebecca Wenhold as Respondent's office manager beginning in January 2004 until February 2009. Her duties as office manager were the same as Rebecca Wenhold's. (N.T. 138–39 Stringer).

10. Sandra Nonnemacher is a former staff member of Respondent's court and was employed there from January 2004 to March 2009. Her duties included entering all kinds of citations, in traffic cases, summary cases, civil cases, and criminal cases. She scheduled hearings, took payments, waited on people at the counter and answered the telephone. (N.T. 196, 219 Nonnemacher).

11. Keith Falko is the Principal of William Allen High School and is the Director

of Secondary Education for the Allentown School District. Mr. Falko met with Respondent on two occasions in April 2004 and in April 2005 to discuss problems the School District was having with truancy cases filed in Respondent's court. William Allen High School is located in Respondent's district. That school has 3,600 students with a high incidence of truancy. (N.T. 227–32 Falko; 363–65 Arcelay).

12. Suzette Arcelay is employed as a home school visitor for the Allentown School District, and she has worked in that capacity for 12 years. In addition to her other responsibilities, Mrs. Arcelay appeared regularly in Respondent's court to prosecute truancy citations against students and parents charged with violating the Compulsory Attendance Law. (N.T. 363–66 Arcelay).

13. Patricia Welle–Feldman is a student services coordinator for the Allentown School District, and she has worked in that capacity since 1990. In addition to her other responsibilities, Ms. Welle–Feldman oversees the enforcement of school attendance and provides support to home school visitors, such as Mrs. Arcelay. Ms. Welle–Feldman knows Respondent in a professional capacity, and she received complaints and correspondence regarding Respondent's conduct, including her lateness, from Mrs. Arcelay and other Allentown School District personnel. Ms. Welle–Feldman memorialized these complaints and recorded them contemporaneously as she received them in a spreadsheet. Ms. Welle–Feldman also appeared in Respondent's court on one occasion on February 13, 2008. (N.T. 426, 430–33, 436, 439, 442 Welle–Feldman).

14. David Vaida is an attorney who has practiced law since 1982, and his practice has been based in Allentown since 1996. Mr. Vaida practices civil and criminal litigation at all levels in Allentown, and he had appeared before Respondent previously. Mr. Vaida is bilingual and has a large Spanish-speaking clientele in Allentown. (N.T. 456–57 Vaida).

15. The Board prepared a chart which was admitted into evidence as Board Exhibit 1. The chart is a record of the dates Respondent "called off," i.e., the dates she called the office to tell her staff that she was taking the day off. The chart also specifies what documents are the source of the information set out in the chart. The dates on which Respondent "called off" shown on the chart were derived from the source documents in which the information of the days Respondent called off was entered contemporaneously with the events themselves. These source documents include:

The Hearing Book kept by Respondent's office staff,

Requests for coverage sent by Respondent's staff to the President Judge,

Coverage Orders issued by the President Judge,

Hearing Cancellations to Allentown Police Department,

Allentown School District Attendance Records,

E–Mails. (Board Exhibit 1, N.T. 27). (Stipulated).

16. Respondent called off from work on the following dates and for the following reasons (when a reason was given by Respondent it is included on the chart; on dates where no reason appears on the chart, no reason was given by Respondent):

September 25, 2007 Called off.
September 26, 2007 Called off at 10:40 a.m.; Respondent informed staff she overslept.

| | |
|---|---|
| October 10, 2007 | Called off; Respondent was also scheduled to cover arraignments for MDJ David Leh. |
| October 18, 2007 | Called afternoon off. |
| November 15, 2007 | Called off at 10 a.m. when Respondent had matters scheduled for 9:30 a.m. Informed staff her boat trailer had arrived and she wanted to stay home to deal with that. People waiting at Respondent's court for hearings had to be sent home and were angry. |
| December 13, 2007 | Called off; Snow. |
| December 17, 2007 | Called off. |
| January 2, 2008 | Called off. |
| January 3, 2008 | Called off. |
| January 4, 2008 | Called off. |
| January 14, 2008 | Called off. |
| February 13, 2008 | Called off; Snow. |
| February 14, 2008 | 40 minutes late. Court had been scheduled to begin at 9:30 a.m. Respondent entered courtroom at 10:10 a.m., relating that her rear window was stuck. Waiting room filled with parents and students on truancy cases to standing room only. Some parents overheard sarcastically commenting: "I'm here again. Let's see if she shows up this time" and "She'll be here this time . . . I hope." After the Respondent arrived, she spent ten (10) minutes talking to her staff about the petty cash account. At 10:35 a.m., the Respondent began hearing the first truancy case. This took 53 minutes. The Respondent then handled 2 arraignments, which further delayed hearing the remaining truancy cases. |
| February 19, 2008 | Called off. |
| March 5, 2008 | Called off. |
| March 6, 2008 | 57 minutes late for truancy hearings. Parents became upset and argumentative with the Respondent's staff, who contacted Lehigh County court offices about parent concerns. |
| April 7, 2008 | Called off. |
| May 5, 2008 | Called off. |
| May 28, 2008 | Called off. |
| June 5, 2008 | Called off. The Respondent was also scheduled to cover arraignments for MDJ David Leh this day. |
| June 6, 2008 | Called off. |
| June 13, 2008 | Called off. |
| July 11, 2008 | Called afternoon off. |
| July 14, 2008 | Called off. |
| August 8, 2008 | Called afternoon off. |
| August 11, 2008 | Called off. |
| August 12, 2008 | Called afternoon off. |
| August 13, 2008 | Called off. |
| August 14, 2008 | Called off. |
| August 15, 2008 | Called off. |
| August 18, 2008 | Called off. |
| August 29, 2008 | Called off. |
| September 3, 2008 | Called off. |
| September 8, 2008 | Called off. |
| September 9, 2008 | Called off. |
| September 11, 2008 | Called off. |
| September 29, 2008 | Called off. |
| October 6, 2008 | Called off. |
| October 8, 2008 | Called off. |
| October 17, 2008 | Called off. |
| October 20, 2008 | Called off. |
| October 30, 2008 | Called off. |
| October 31, 2008 | Called off. |
| November 5, 2008 | Called off. |

| | |
|---|---|
| November 17, 2008 | Called off. |
| November 18, 2008 | Called off. The Respondent was also scheduled to cover arraignments for MDJ David Leh this day. |
| November 19, 2008 | Called off. The Respondent was also scheduled to cover arraignments for VIDJ David Leh this day. |
| January 28, 2009 | Called off; Snow. |
| February 9, 2009 | Called off. |
| February 23, 2009 | Called off. |
| March 6, 2009 | Called off. |
| March 9, 2009 | Called off. |
| March 11, 2009 | Called off. |
| March 13, 2009 | Called off. Coverage Order states "unavailable because of doing campaign issues." |
| March 16, 2009 | Called off. Coverage Order states "unavailable because of doing campaign issues." |
| March 18, 2009 | Called off. |
| March 20, 2009 | Called off. Coverage Order states "unavailable because of campaign issues." |
| March 23, 2009 | Called off. Coverage Order states "unavailable because of campaign issues." |
| March 24, 2009 | Called off. |
| April 1, 2009 | Called off. |
| April 3, 2009 | Called off. |
| April 6, 2009 | Called off. |
| April 7, 2009 | Called off. |
| April 8, 2009 | Called off. |
| April 9, 2009 | Called off. |
| April 13, 2009 | Called off. |
| April 16, 2009 | Called off. |
| April 17, 2009 | Called off. |
| April 20, 2009 | Called off. |
| April 22, 2009 | Called off. |
| May 1, 2009 | Called off. |
| May 4, 2009 | Called off. |
| May 5, 2009 | Called off. |
| May 6, 2009 | Called off. |
| May 7, 2009 | Called off. |
| May 11, 2009 | Called off. |
| May 12, 2009 | Called off. |
| May 13, 2009 | Called off. |
| May 14, 2009 | Called off. |
| May 15, 2009 | Called off. |
| May 18, 2009 | Called off. |
| May 19, 2009 | Called off. |
| June 1, 2009 | Called off. |
| June 16, 2009 | Called off. |
| June 30, 2009 | Called off. |
| August 12, 2009 | Called off. |
| August 14, 2009 | Called off afternoon. |
| August 21, 2009 | Called off afternoon. The Respondent left for lunch and then called back in the afternoon and told staff she was "beat and taking the afternoon off." Remaining hearings continued. No coverage. arranged. |
| August 24, 2009 | Called off. |
| August 28, 2009 | Called off afternoon. |
| September 1, 2009 | Called off. |
| September 2, 2009 | Called off afternoon. |
| September 23, 2009 | Called off afternoon. |
| September 24, 2009 | Called off. |

| September 28, 2009 | Called off. |
| October 5, 2009 | Called off. |
| October 7, 2009 | Called off. |
| October 8, 2009 | Called off. |
| October 12, 2009 | Called off. |
| October 13, 2009 | Called off. |
| October 14, 2009 | Called off. |
| October 15, 2009 | Called off. |
| October 16, 2009 | Called off. The Respondent advised staff she might as well include Friday, since she had been out the entire week. 76 hearings continued during the week. |
| October 19, 2009 | Scheduled to attend minor judiciary continuing education classes. The Respondent did not attend. Instead, the Respondent used the time to campaign for re-election. |
| October 20, 2009 | Scheduled to attend minor judiciary continuing education classes. The Respondent did not attend. Instead, the Respondent used the time to campaign for re-election. |
| October 21, 2009 | Scheduled to attend minor judiciary continuing education classes. The Respondent did not attend. Instead, the Respondent used the time to campaign for re-election. |
| October 22, 2009 | Scheduled to attend minor judiciary continuing education classes. The Respondent did not attend. Instead, the Respondent used the time to campaign for re-election. |
| October 23, 2009 | Scheduled to attend minor judiciary continuing education classes. The Respondent did not attend. Instead, the Respondent used the time to campaign for re-election. |
| October 30, 2009 | Called off. |
| November 2, 2009 | Called off. |
| November 3, 2009 | Called off. |
| November 4, 2009 | Called off. |
| November 30, 2009 | Called off. |
| December 2, 2009 | Called off. |
| December 14, 2009 | Called off. |
| December 15, 2009 | Called off. (Board Exhibit 1, N.T. 987–88). (Stipulated). |

17. Between September 12, 2007 and December 15, 2009, Respondent "called off" 116 days. In addition, during that same period of time, she took 49 vacation days. That comes to 165 workdays on which she did not work during that period. Allowing for the 31 paid holidays a year, we count 559 workdays from September 12, 2007 to December 15, 2009, therefore Respondent did not work on 30% of the workdays during that period. (N.T. 535, 986–88, 562–568 Merlo, Board Exhibit 1).

18. When Respondent called off she didn't do so until 10, 10:30, 11 a.m. (N.T. 141 Stringer; 369 Arcelay).

19. In Respondent's court, hearings were always listed to begin at 9:30 a.m., but Respondent rarely arrived on time. When she didn't "call off," her customary time of arrival was 10:00 a.m. to 10:30 a.m. (N.T. 69–72 Wenhold; 140–42 Stringer; 220–21 Nonnemacher; 366–67 Arcelay).

20. Many cases of all kinds were continued multiple times. (N.T. 204 Nonnemacher; 369, 371–77 Arcelay; 459 Vaida; 683 Alcaro, Board Exhibit 8).

21. Respondent's habitual lateness and frequent "call offs" had serious detrimental consequences on the efficiency of her office requiring the staff to, *inter alia:*

placate justifiably angry litigants and witnesses (or, at least, attempt to do so),

telephone lawyers and litigants and witnesses to notify them that their case would not be heard that day,

determine what dates were available for rescheduling the continued hearing,

determine the date on which to list the continued hearing,

prepare and mail notices of the date on which the continued hearing was relisted.

This took the staff most of the morning to accomplish, thus seriously interfering with the staff's ability to deal with the regular, day-to-day, business of the court. (N.T. 110–11 Wenhold; 143–44, 148–49, 163–65 Stringer; 208–09 Nonnemacher).

22. In the ordinary course of the business of Respondent's court she was required to sign numerous documents. Those included warrants, landlord-tenant worksheets, time served reports, constable cost sheets, citations, dispositions of summary traffic and non-traffic cases. Commonly, Respondent did not sign these when she should have and the paperwork piled up causing a severe negative impact on the operation of her court. (N.T. 104–06, 109–10 Wenhold; 163–65 Stringer; 198–200 Nonnemacher).

23. Stephen Milkovits is a detective for the City of Allentown Police Department. He holds a degree in Criminal Justice from Kutztown University. He has been employed as a police officer by the Allentown Police Department since 2002 and has appeared in Respondent's court approximately two dozen times. (N.T. 637–39 Milkovits).

24. We find that the events related by the witnesses in the testimony in this record reproduced in the Discussion which follows occurred as described in the testimony at the times and with the frequency as related by the witnesses.

### Discussion

We set out here samples of the testimony which leads us to make Findings of Fact Nos. 5–24.

Rebecca Wenhold, Respondent's office manager testified:

Q. Can you explain for the Court the effect that you have observed of Judge Merlo's absences on the paperwork flow of the office?

A. There was normally a backlog of paperwork waiting to be addressed or signed by Judge Merlo on the date that she would call off.

Q. Was she aware of the backlog, to your observation?

A. I believe so.

Q. How so?

A. Frequently, she would—not frequently, but I know she would comment when night duty was coming up that she would be addressing things at night duty, things like that, that I knew she would be working on when she was on night duty and didn't have hearings to attend to.

Q. Where was this backlog paperwork stored?

A. There was—each of us that printed warrants would keep the warrants on our desk. There were constable cost sheets for service that were on top of a filing cabinet within the office. There were boxes of paperwork in— we have a back storage room that most of our filing cabinets are kept in and that's where the majority of the boxes of signings were closed out cases and things like that.

Q. Now, when you say closed out cases, what do you mean?

A. Citations that the person had been making payments on and finally paid off or something along those lines. There's a space on the back of the citation to be signed by the judge.

Q. When does the judge typically sign the citation?

A. If they hold a hearing on the case, normally they sign at the time of the hearing. Otherwise, the case is closed.

Q. Is it your testimony that Judge Merlo did not sign those dispositions at the close of the case?

A. Not immediately upon the close of each case.

Q. And these unsigned citations were kept in a box?

A. They were kept in boxes, yes.

Q. Is that true for summary—to the best of your knowledge, is that true of summary traffic and non-traffic cases?

A. Yes.

. . . .

Q. What effort did Judge Merlo take based on your observation to address this backlog?

A. When she was on night duty, she would sign when she had down time in the office. The occasions that it happened, she would take boxes and sign.

Q. How many boxes are we talking about of unsigned work?

A. Six to eight, I believe.

JUDGE JAMES: I'm a little unclear. What was the effect of having this paperwork backlogged?

. . . .

A. If we had to locate one of the cases that was in one of the boxes, it would be time consuming to locate the case we were looking for, and we couldn't get them filed way with the other cases to be archived and out of the office to free up space in the office.

Q. And what was the effect on your work when you had to obtain coverage for Judge Merlo when she was absent?

A. The obtaining coverage part wasn't that time consuming. It was more the rescheduling of everything that took more time. Normally, it didn't take long to call a couple judges and get one to cover.

Q. Well, explain to me the process of the rescheduling. How long did that take, typically?

A. Depending on how many cases and how many parties might be involved, most of the morning till we got through the calls. We'd call in order of the hearings, but it was generally most of the morning.

JUDGE JAMES: And would notices have to be sent, then, to these people when they were rescheduled?

THE WITNESS: Notices of the new trial dates, yes.

JUDGE JAMES: Yeah. You didn't do it all on the phone. You had to send formal notices?

THE WITNESSES: Right. We had to go into each case and continue the hearings and we'd send notices to everyone. (N.T. 104–06, 109–11).

Deborah Stringer, who preceded Wenhold as office manager, testified:

Q. What were your basic office duties for Judge Merlo?

A. I ordered supplies, I ran the whole entire office, manager of all the staff, scheduled hearings, everything, I did everything.

Q. Would you characterize Judge Merlo's court as a busy court?

A. Very busy.

Q. Did it get busier throughout the years of your employment?

A. Yes.

Q. When would staff members typically arrive on a regular workday when you were working?

A. We came in anywhere from 8:00 a.m. until, you know, 8:30.

Q. When did Judge Merlo arrive, typically?

A. 10:00, 10:15, 10:30.

Q. Did she ever call to inform you that she was going to be late?

A. Yes.

Q. Was that typical or atypical in your experience?

A. Well, she did call and say she was going to be late. But sometimes she would call back and say she wasn't coming in at all.

Q. What time, typically, would she call to indicate that she was going to be late?

A. Well, after the start of hearings, 9:30 to quarter of 10:00.

Q. What time would she typically call when she was going to call off?

A. After 10:30.

Q. You said that you're responsible for scheduling Judge Merlo's hearings.

A. Yes.

Q. Where did you record these hearings or scheduling?

A. In a hearing book.

Q. And the hearing book was just a ledger, not an official court document?

A. Well, to me it was official because everything was recorded in there and everything that was handed down from the court of common pleas was entered in there, central court, night court and so forth.

. . . .

Q. You had said that—you had testified that hearings had begun at 9:30, were scheduled to begin at 9:30, and you had also testified that Judge Merlo didn't arrive typically until 10:00 or 10:30.

A. Correct.

Q. Whose decision was it to schedule hearings at 9:30?

A. Well, I would say it was the judge's. When we had a busy schedule, there is no way we could schedule any other—I mean, we had one every 15 minutes.

Q. Typically, how many hearings would you have a day?

A. God—

Q. Just an estimate.

A. —thirty, just guessing.

Q. Did Judge Merlo ever instruct you to push back the time at which you scheduled hearings to start in order to accommodate—

A. No.

Q. —when she would arrive at court?

A. No.

Q. So to clarify, in your experience was she not typically present when hearings began?

A. No.

Q. Can you describe how Judge Merlo's lateness and absences affected your duties as someone who scheduled her hearings and her daily schedule?

A. Lateness and absences?

Q. Yes.

A. Well, it affected it a great deal because the absences—we have a great deal of backlog, and it affected the public and our staff because it created a lot more work for them.

Q. Did anyone ever complain to you or to the office about Judge Merlo being late or absent?

A. Yes, a lot, a lot of times.

Q. Was Judge Merlo aware of these complaints?

A. I'm sure she was aware of them, but I don't think she really cared.

Q. Did you ever—

MR. STRETTON: Objection. I don't think she really cared, it's certainly not evidentiary facts.

JUDGE MORRIS: Sustained.

MR. STRETTON: I ask that it be stricken.

JUDGE MORRIS: In the form it was—it wasn't responsive to a particular question, so I'll sustain it.

BY MR. KLEMAN:

Q. Did she react or appear to react to these complaints?

A. No.

. . . .

Q. How many times, to your experience—are you able to estimate how often she would call off on the day that she was not coming in?

. . . .

THE WITNESS: An average of two times a week; at least, or more.

BY MR. KLEMAN:

Q. From the years that you were working for her?

A. Yes.

Q. When Judge Merlo would call up, who would she speak to?

A. Well, sometimes if I would answer, she'd talk to me, other times whoever answered the phone.

Q. Would you memorialize these calls, write it down?

A. Yes.

Q. Where would you write it down?

A. In the hearing book. And then I'd have to do a court order to get coverage for that day.

Q. What else would you have to do?

A. Cancel everything, continue everything.

Q. Were there any special steps that you took for particular types of cases, such as criminal cases?

A. Well, I had to call the attorneys that were involved and the police department. Also, you'd have to fax them to let them know. We'd also have to notify any witnesses or defendants, if they have phone numbers. That all went you had to look on the computer and in the case to make sure you got pertinent enough information.

Q. What, exactly, would you write in the hearing book when the judge would call up on a day that—

A. If there was a call up, I'd put judge called up. If she was sick, I'd put judge sick.

Q. What about vacation time?

A. Judge on vacation.

Q. Holidays, court holidays?

A. Yeah, the holidays were all written in. Like I said, I got a schedule from the court of common pleas, and I took that immediately and wrote it all in the book for the whole year.

Q. When the judge would call off during the time that you were working, did you observe any type of pattern with her call offs?

A. She went to football games on a Sunday. She had season tickets with the Philadelphia Eagles—

MR. STRETTON: Objection. Nonresponsive.

JUDGE MORRIS: Overruled. You know, I'm assuming that it will lead someplace.

MR. STRETTON: It doesn't.

JUDGE MORRIS: I mean, the games are on Sunday.

THE WITNESS: They were on Sunday and then she didn't come in on Monday.

BY MR. KLEMAN:

Q. So you had said earlier that sometimes the judge had indicated that she

was sick and that she wasn't coming in. Correct?

A. Not very often.

Q. Were there any other reasons that she would supply to you when she would call off on the days she was otherwise—

A. Most of the time, there was no reason given.

Q. No reason at all?

A. No. She just said she wasn't coming in.

. . . .

Q. When Judge Merlo—when you would have to continue a case due to Judge Merlo's absence, how far ahead would you have to schedule a criminal case?

A. Sometimes two, three months out because of her schedule. It was booked.

Q. What about truancy cases?

A. Same thing.

. . . .

Q. Did you ever receive a complaint from any parties or litigants when Judge Merlo was absent and the cases had to continue?

A. Yes, I had a near riot in—

MR. STRETTON: Objection. A near riot.

JUDGE MORRIS: That's a description. Overruled.

BY MR. KLEMAN:

Q. Continue.

A. It was with Allentown School District. The vestibule was packed with students and parents, and she was really—she was really late, really late. And they were getting antsy and nasty. I had one gentleman stand up, and he—

MR. STRETTON: Objection. Hearsay.

JUDGE MORRIS: No. No, go ahead. A man stood up is not hearsay.

MR. STRETTON: She's going to say what he said next.

JUDGE MORRIS: Well, it would be a reflection of his state of mind at the time, which I think is what's being inquired. So I will overrule that. What happened?

THE WITNESS: He stood up and he was ranting and raving and just getting upset because she wasn't there. And everybody was getting—and it was getting loud. I mean, I feared for the staff.

. . . .

Q. How would Judge Merlo's absences affect your work as office manager?

A. Extremely. We had to continue everything. I had to make a lot of phone calls, fax a lot to people and it just—it created a lot of work, a lot of work, extra work.

Q. Are you able to estimate how long it took you to cover for her absences on a given day?

A. Time frame?

Q. Time frame.

A. Oh, God, at least the whole morning of me making phone calls and pulling files and getting things rescheduled, at least or if not more, longer.

Q, And how are you able to—are you able to recall how Judge Merlo's absences affected the flow of paper in and out of the office?

A. A great deal, A lot of things weren't getting signed.

Q. Go on, explain,

A. Well, the worksheets we had to put back there to get signed, there were piles of time served on the bench that were waiting to be signed. I had cases that were—I used to print out

aging reports for cases that weren't—because I wanted to see how our flow of work was coming, and I highlighted a lot of cases that were being on the aging case list too long and show her, and a lot of stuff was on her bench. I gave it to her, but sometimes nothing was done.

Q. And what was her response when you would present these matters to her?

A. She looked at it, but not really any response.

JUDGE MORRIS: What's the time served sheet?

THE WITNESS: Time served, it's when a defendant and—

JUDGE MORRIS: Oh, criminal case time served.

THE WITNESS: Or traffic or non-traffic.

JUDGE MORRIS: It's giving them credit for the time they served.

THE WITNESS: Correct.

JUDGE MORRIS: They were not given the credit promptly because of this?

THE WITNESS: Correct.

BY MR. KLEMAN:

Q. Was there a backlog in your own work?

A. Yes.

Q. Would you explain that for the Court?

A. Well, we had a lot of continuances to do and everybody had piles all over their desks. I mean, everyone.

Q. Piles of what?

A. Work to be done.

Q. Could you explain?

A. Landlord/tenants to be rescheduled, non-traffic cases to be rescheduled, criminal cases, civil cases. (N.T. 139–44, 149–53, 157–59, 163–65).

Sandra Nonnemacher, a member of Respondent's office staff testified:

BY MR. KLEMAN:

Q. How did Judge Merlo, just based on your basic observation of her office demeanor, how did she appear to approach being a judge?

. . . .

A. Well, I think she didn't realize everything that was involved in her job because she would come in late and have her hearings and then leave, instead of there were like papers to be signed, which didn't always get signed right away.

Q. How did Judge Merlo's approach to her paper duties affect your work?

A. Well, because sometimes we just—things just piled up. Like when she didn't sign warrants, they would all get signed at the same time and then we'd have to file them away. And a lot of the civil cases didn't get signed right away. It just made—things just piled up at one time.

. . . .

Q. Did Judge Merlo—can you think of any occasions where Judge Merlo may have called off on a scheduled truancy hearing date?

A. Yes.

Q. Could you explain that to the Court?

A. Well, she called off quite a bit because some of the cases were continued two or three times. People would get very upset about it because we'd have to reschedule them.

Q. When you say continued two or three times, how far out would you have to continue the cases?

A. Well, we had a lot of cases and we'd clear maybe 16 to 20 cases a day, twice a week, and there were some-

times when one was scheduled months ahead. So as soon as the first opening after that came up, we would schedule the new ones. (N.T. 198–200, 204).

Suzette Arcelay, the home school visitor for the Allentown School District, was required to be in Respondent's court two days a week[1] when truancy cases were listed. It was her job to present the documentation of illegal absences which the school district had compiled. She testified that on those days she customarily arrived at Respondent's court between 8 and 9 o'clock in the morning. She went on to testify:

Q. What time does Judge Merlo typically arrive, physically, at her courtroom?

A. Between 10:00, 10:30.

Q. And the hearings were scheduled to start at what time?

A. 9:30.

. . . .

Q. Are you aware of whether Judge Merlo ever called off on the day that truancy hearings were scheduled?

A. Yes.

Q. Why don't you explain for the Court what happens when Judge Merlo calls off.

A. Well, we didn't know when she was going to call off. Sometimes it was—we would sit there until about 10 o'clock, 10:30, a couple of times even 11:00, and we would just not know whether she was coming in or not. Even when the phone would ring, we would sort of stare at it to see if it was her letting us know whether she was coming in or not.

Q. And when she didn't show, what happened?

A. We would have to continue the hearings. The—the secretaries would figure out who was going to tell the families that we needed to continue the hearings.

Q. Did you ever tell the families that the hearings had to be continued?

A. Yes, at times, I did.

Q. And what was their reaction?

A. They would be very upset and angry because many of those hearings had been continued many times.

Q. Did you memorialize Judge Merlo's absences in some fashion?

A. Yes.

Q. And where did you do that?

A. I would keep a log. I would have to keep a log for my superiors.

Q. And you communicated that to the school district?

A. They're the ones—they're the ones that required me to do it. I didn't understand your question.

Q. Well, what I'm asking you is: Did you ever compile a list of the days that she was absent?

A. Yes, pretty much.

Q. Included in that list, were there days that she was late?

A. Late or absent.

Q. Did she ever provide an excuse to you or did you ever learn of an excuse for her absence?

A. Sometimes she would let me know why she wasn't in or late.

Q. What would she say to you, typically?

A. Different excuses. I would say—I remember one, something with her dog got into an oil pan or something with oil and she had to give it a bath, or her window was broken, or the

---

1. At some time this was changed to one day a week.

ceiling fell on her, something like that. (N.T. 367–71).

Referring to a truancy case on Board Exhibit 8, Mrs. Arcelay explained:

Q. Tell us about the first name.

A. Well, the cases—well, in his case, the case continued—was continued several times. There were times when she would continue the case, the judge would continue the case, to see if a student would improve the case—improve their attendance. However, when it was rescheduled and she was absent, the judge was absent, or rescheduled again and the judge was absent again, that's why it got continued over and over again until we finally had a hearing date where both the family and the judge would come into the court, would be there. (N.T. 376).

Mrs. Arcelay spoke about how parents reacted to repeated continuances because of Respondent's failure to come to work:

Q. Were any of these complaints given to you at Judge Merlo's court?

A. Yes. And at the school.

Q. Can you recall any incidents, any particular incidents, where Judge Merlo's absence caused a problem?

A. Yes.

Q. Could you explain that for me?

A. There was an incident where the case had been continued several times. I—I don't remember the number, two or three times, and it was continued again, and that time, the family had specifically—

MR STRETTON: Objection to what the family said.

JUDGE MORRIS: Well, Mr. Stretton, here is my view on it: The effect of the nonattendance is an important issue here, and the family's reaction to having a case continued and having to show up and have nothing happen I think is relevant.

MR. STRETTON: I disagree. I mean, people react in courtrooms wrongly many times. I mean, it's meaningless unless you have the person. Then I could question them, "Well, yes, but there were three continuances granted to give your son a chance. This time you're upset?" You know, that kind of thing.

JUDGE MORRIS: Well, you can ask her about any more specifics you wish, but I think the parents' reactions to continuances is relevant.

MR. STRETTON: Just—I think it's a very dangerous road because any judge, no matter what they decide—

JUDGE MORRIS: It's overruled.

MR. STRETTON: —are going to have unsatisfied people.

BY MR. KLEMAN:

Q. You can answer.

A. That particular day—there were many instances where families were very upset because the—it was continued and they had to take off from work. A lot of these were working families who—it was very difficult for them to take off to be in court. And—but this particular day was the worst time that the families got really upset, were wanting to call someone. They wanted a number. They wanted to complain. And they were getting very agitated. And so we gave them a number they could call. (N.T. 378–80).

Patricia Welle–Feldman is the student services coordinator for the Allentown School District and is responsible for a number of programs and services including oversight of the enforcement of The Compulsory Attendance Law as well as truancy prevention. After receiving nu-

merous complaints from Suzette Arcelay and others about Respondent's habitual lateness and absence from court and the problems that was causing, she began keeping a record of the days she was late or "called off"—on days when truancy cases were listed. That information is incorporated in Board Exhibit 1; it appears in the fifth column of Board Exhibit 1. She testified as follows:

Q. Could you just summarize the complaints that you received?

. . . .

A. I received phone calls from Suzette Arcelay, the home school visitor, assigned to William Allen High School. I received e-mail correspondence from Suzette Arcelay. I received documentation regarding absences and late arrivals to court and the reasons given for those absences. I received e-mail and phone messages and in-person reports from Billie Harker who is a secretary, who is notified by—was notified by MDJ Merlo's office when she was going to be—when there would be a delay for court or when she was not going to appear for court.

Q. Did you memorialize these complaints?

A. Yes, I did.

Q. And how did you do so?

A. I put them in an Excel spreadsheet with the date, the absence—or the reason for the absence and the reason given, and I believe, also, for some of them, the number of cases that were scheduled for that particular day.

. . . .

Q. Now, when you were talking about these complaints, what did you do with these complaints?

A. Well, I was supportive to the staff, of course. And initially, after compiling some of them, I notified Gordon Roberts in Lehigh County Court Administration Office regarding the situation, and I believe our initial request was for a reassignment of truancy cases out of MDJ Merlo's court.

Q. Did you describe your position on Judge Merlo's absences and lateness and their effect on school discipline to Mr. Roberts?

A. I'm not—I believe, in that initial letter, I raised concern that it seemed inconsistent—at least, inconsistent to have a judge appearing late or not appearing at all for hearings regarding truancy and tardiness with students where we're trying to hold people accountable for being where they're supposed to be.

Q. Now, when did you begin to compile—I believe it's been covered, but the list that you compiled, was that on your own initiative?

A. No.

Q. Whose—how did that come about?

A. I—after receiving complaints from the homeschool visitor and—I went to my supervisor. At the time, that was Ralph Dolbert. He's no longer with the district. He's since retired. And discussed the concerns with him. And I—we decided we would send the information complaints to Gordon Roberts and ask for the reassignment of cases. (N.T. 430–32, 439–41).

Attorney Vaida related an experience he had in Respondent's court in the case of *Carballo v. Easterday:*

Q. Could you describe Ms. Carballo's case for the court?

A. Well, I mean, this is an aside: I'm bilingual. I grew up in Puerto Rico, so I speak Spanish and I have a large Spanish-speaking clientele. Angela is a Spanish speaker and she was having some issues with a tenant which we

needed to have removed from one of her properties. So she came to me to file an action to do that, so I did.

Q. When you say problems with her properties, do you recall the problems?

A. You know, I don't recall exactly what it was, but the tenant, you know, wasn't paying the rent and they had had issues before. I mean, it was an ongoing problem between the landlord and the tenant, and the landlord had to—you know, had had enough. And there was also the issue that the City needed certain repairs to be made and the tenant wouldn't allow entry to Ms. Carballo. So that became an additional reason we had to remove the tenant, because we had to get in there and make certain repairs that were ordered by the City.

Q. So you filed a landlord/tenant complaint and request for repossession?

A. Correct.

Q. In whose court did you file that, sir?

A. District Justice Merlo.

Q. Had you practiced in front of Judge Merlo prior to that?

A. Yes.

Q. I'm going to show you what I've premarked as Board's Exhibit Number 10. Do you recognize that document, sir?

A. I do.

Q. What is it?

A. It's a letter that I wrote to Gordon Roberts, who is the person in the Lehigh County Court to whom you would go if you have an issue with a district justice. Usually, it would be that I asked for a continuance and it gets denied. Then I would go to Gordon and give him the reasons why and then Gordon can countermand the district justice and grant a continuance.

That was usually the context in which I knew him. And when I started having the problems with the case being continued a number of times and my client getting increasingly agitated about that, I filed a—quite frankly, I had enough and so I called Gordon to find out what exactly would be the procedure to get a change of venue because I thought I was going to need that.

Q. Now, when you say the case was continued a number of times, are you referring to the Carballo case?

A. Correct.

Q. How many times was it continued by Judge Merlo's court?

A. Well, I think it was five all totaled. Yeah, five.

Q. I'm going to show you what I have marked as Board's Exhibit Number 11.

A. Yes, sir.

Q. Do you recognize those documents, sir?

A. I do.

Q. Can you explain for the court what they are in sequence?

A. Well, these are a series of continuance notices form District Justice Merlo's Court. The first one is April 6th, 2009; the second one is—it appears to be April 22nd, 2009; the third one is May 6th, 2009; the fourth is May 12th, 2009.

Q. Now, I'm asking your opinion as a professional, sir. What was your concern with these multiple continuances in the Carballo case?

A. Well, I mean, it's not even a matter of my—you know, my own opinion, which is, of course, that, I mean, unless there's a good reason, the district justice should hear the case promptly. I mean, I think that's self-evident.

But my client was getting extremely agitated and, of course, I was receiving, you know, the heat in trying to explain to her why her case wasn't being heard when she had a tenant that wasn't paying any rent and she had an order from the City ordering her to get into the apartment to make repairs.

JUDGE MORRIS: Okay. I think we understand that. You've got a client that wants some action. You file a case that gets continued all the time. Did you have to show up on these dates, or did you get advance notice about them?

THE WITNESS: No, my office was called.

JUDGE MORRIS: And told it was going to be continued?

THE WITNESS: Correct.

JUDGE MORRIS: And, eventually, you asked that it be reassigned?

THE WITNESS: Correct.

JUDGE MORRIS: And it was reassigned?

THE WITNESS: It was.

JUDGE MORRIS: And it's my understanding from the pleadings that all of that's been admitted by the other side?

MR. KLEMAN: Yes. (N.T. 456–61).

Detective Stephen Milkovits lives in Tamaqua, an hour's drive from Respondent's court. He was the arresting officer in a case in Respondent's court named *Commonwealth v. Renninger*. He testified as follows:

Q. Did you, as the arresting officer, receive notice as to the hearing date for Renninger?

A. I did

Q. From whom?

A. District Judge Merlo's courtroom.

. . . .

Q. What did you do in reference to that notice?

A. Well, of course, I marked down all my hearings in my book. The day of the hearing, I had worked the night before. I was working steady night shift. Again, I live an hour from the City of Allentown, from Judge Merlo's courtroom. The day of the hearing, that afternoon when I woke up, prior to leaving my house, I had gotten in the habit of calling Judge Merlo's court.

Q. Why?

A. Because of frequent times where she wouldn't be there. And gas was, you know, at some times, $4 a gallon and driving an hour on—you know, for four bucks a gallon only to—no one to be there, you know, it just got frustrating. So I just got in the habit of I would call her court and talk to her staff, see if she was there, make sure the hearing was still going on as scheduled.

Q. Was that a practice, as you've described? A habit on your part?

A. Absolutely, it was.

Q. Did you arrive on the first scheduled date, September 23rd?

A. Yes. As I was stating, I—I had called her courtroom that afternoon before I left, asked if the hearing was still going on as scheduled. They advised me that the judge had been in this morning, they we expecting her to be returning in the afternoon. I said, "Okay. I'll be down." I got in my car, drove all the way down, opened up the door into the waiting room for court, and realized I was the only person in there. I walked up to the window. The office staff kind of looked at me and they said, "You didn't get the call?" And I said, "Let me guess,

she's not coming back this afternoon." They said, "No, she's not." I said, "Okay." I turned around, I walked out, got in my car, and went home. (N.T. 641–43).

We find that Respondent's conduct described in the testimony set out above is clear and convincing evidence of violation of:

1. Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges as charged in Count 4;

2. Article V, § 18(d)(1) of the Pennsylvania Constitution for the conduct is such that brings the judicial office into disrepute as charged in Count 6;

3. Rule 3A. of the Rules Governing Standards of Conduct of Magisterial District Judges as charged in Count 2;

4. Article V, § 18(d)(1) of the Pennsylvania Constitution by neglecting or failing to perform the duties of her office as charged in Count 7; and

5. Rule 5A. of the Rules Governing Standards of Conduct of Magisterial District Judges as charged in Count 4.

We will address these findings in the order they are listed above.

■ 1. In the case of *In re Lokuta*, 964 A.2d 988 (Pa.Ct.Jud.Disc.2008); *aff'd*, 608 Pa. 223, 11 A.3d 427 (2011), this Court dealt with the question of whether that Respondent's lateness and absence from court was a violation of Canon 3A(3). The language of that canon is the same as the language of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges.

Rule 4C. provides:

Magisterial District Judges should be patient, dignified and courteous to litigants, witnesses, lawyers and others with whom they deal in their official capacity, and shall require similar con-

duct of lawyers, of their staff and other subject to their direction and control.

In *Lokuta* we found that:

Respondent's custom of arriving 15, 20 minutes, or a half hour or an hour late for scheduled court sessions is the quintessential discourtesy to litigants, jurors, witnesses and lawyers. When it is commonplace, as here, it takes on the character of arrogance and disrespect for the judicial system itself, as well, of course, disrespect for those who, bidden by the court to be in court at a time chosen by the court, wait, sometimes in a "packed courtroom," for the arrival of the judge.

■ 2. In *Lokuta* we went on to say:

These considerations lead us to a contemporaneous finding that this conduct is such that brings the judicial office into disrepute which subjects Respondent to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

In *In re Trkula*, 699 A.2d 3, 7 (Pa.Ct. Jud.Disc.1997), this Court (referring to our opinion in *In re Smith*, 687 A.2d 1229 (Pa.Ct.Jud.Disc.1996)) said:

. . . this Court noted that the conduct of a judge which results in a decline in the public esteem for that judge, may not support the conclusion that the conduct has brought the judiciary as a whole into disrepute, absent a persuasive showing by the Board that the conduct is so extreme as to have brought the judicial office itself into disrepute.

In *In re Cicchetti*, 697 A.2d 297, 312, *aff'd*, 560 Pa. 183, 743 A.2d 431, 444–45 (2000), this Court noted that:

The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular

conduct in each case is scrutinized and weighed.

We note that for most of the occupants of the benches in this Respondent's courtroom—the litigants, the jurors and the witnesses—this is a once-in-a-lifetime experience, their only exposure to the judicial system; and what they take away will be based largely, if not predominantly, on the conduct of the judge.

In *Smith* we said that:

> "Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct.

*Smith, supra,* at 1239; *see also, In re Harrington,* 877 A.2d 570, 576 (Pa.Ct. Jud.Disc.2005), *aff'd,* 587 Pa. 407, 899 A.2d 1120 (2006); *In re McCarthy,* 828 A.2d 25, 29 (Pa.Ct.Jud.Disc.2003); *In re Zoller,* 792 A.2d 34, 38 (Pa.Ct.Jud.Disc. 2002); *In re Strock,* 727 A.2d 653, 657 (Pa.Ct.Jud.Disc.1998); and *In re Trkula,* 699 A.2d at 7.

Certainly the reasonable expectations of the public would include the expectation that the judicial officer act with the same respect for the court as those members of the public did by obeying the court's scheduling order; would include the expectation that the judicial officer would act with consideration for the time and schedules of the hardworking people who crowd her courtroom; and would include the expectation that a judicial officer would conduct herself with the same deference and consideration for others as is taught in the schools and in the homes of Luzerne County. Respondent's conduct described in this record is the kind of conduct which gives the judicial office itself and courts in general a "bad name."

We conclude that the conduct of Respondent was so extreme as to bring the judicial office into disrepute.

*In re Lokuta, supra,* at 1005–06.

We conclude, as we did in *Lokuta,* that the conduct of Respondent was so extreme as to bring the judicial office into disrepute.

We are obligated to mention, however, that while we described Lokuta's conduct as "egregious," this Respondent's practice of "calling off" was *beyond egregious.* When one is first presented with the testimony set out above that this Respondent "called off" at 10, 10:30, even as late as 11 a.m. all the while knowing that she had a list of as many as 30 hearings scheduled to begin at 9:30 a.m., all the while knowing that her waiting room was crowded with citizens in need of her court and by others who had been summoned there by her, and all the while knowing the serious inconvenience and extra burden she was placing on her staff, and then, when one is presented with Board Exhibit 1 and all its documentation that Respondent did this day after day, week after week, month after month, year after year, one's inclination is to reject this evidence—it, simply, is hard to believe. But it is true: the witnesses are all quite credible—their testimony is unchallenged; Board Exhibit 1 is extremely well documented—and Respondent stipulates as to its truth and accuracy. Our evaluation of this record is further influenced by the emphatic testimony of former President Judge Platt and Court Administrator Roberts that Respondent was totally unamenable to their corrective efforts. Moreover, the Respondent's partial explanation—that she did not take vacation—not only fails to address the issue of inconvenience to scheduled litigants, but is also belied by the evidence showing that she did take vacation. We are left, then, with a judicial officer who is at once callous and

uncaring, oblivious and incurious of the consequences of her conduct—conduct which was unchecked even by written warnings and admonitions from the magisterial district court administrator[2] and from her president judge.[3]

This is not to mention that that on the days when this Respondent *did* come to work, she was *never* at work on time—she was *always* late. Her list began at 9:30 a.m. and she didn't arrive until 10:00, 10:15 or 10:30 a.m.[4] Notwithstanding all the testimony, we believe that, in all probability, there were *some days* when Respondent did arrive for work by 9:30 a.m. Even so, where does that leave us? It leaves us with a judge who is *almost always* late. We find that this conduct, by itself, constitutes a violation of Rule 4C. and of Article V, § 18(d)(1) of the Constitution as conduct which brings the judicial office into disrepute. *In re Lokuta*, 964 A.2d at 1005–06.

■ 3. & 4. The conduct described above we consider to be essentially an *ipso facto* violation of Rule 3A. of the Rules Governing Standards of Conduct of Magisterial District Judges as well as of Article V, § 18(d)(1) of the Pennsylvania Constitution.

Rule 3A. provides:

Magisterial district judges shall devote the time necessary for the prompt and proper disposition of the business of their office, which shall be given priority over any other occupation, business, profession, pursuit or activity.

The pertinent language of Article V, § 18(d)(1) provides:

**2.** See Board Exhibit 12, dated April 8, 2005.

**3.** See Board Exhibit 2, dated March 7, 2008.

**4.** N.T. 69–70 Wenhold; 140 Stringer; 221 Nonnemacher; 367 Arcelay; 430–31, 439–41 Welle–Feldman.

(d) A justice, judge or justice of the peace shall be subject to disciplinary action pursuant to this section as follows:

(1) A justice, judge or justice of the peace[5] may be suspended, removed from office or otherwise disciplined for ... neglect or failure to perform the duties of office....

It does not take much discussion to determine whether the Board established Respondent's violation of these two provisions. We have only to point out that

— when the judge is absent from her court with the frequency here established the judge is not "devoting the time necessary for the prompt and proper disposition of the business of [her] office" (Rule 3A.); and she is not tending to her duties, she is "neglecting or failing to perform the duties of [her] office." (Article V, § 18(d)(1) Pa. Const.);

— when cases are continued over and over again the judge is not "devoting the time necessary for the prompt and proper disposition of the business of [her] office" (Rule 3A.); she is "neglecting and failing to perform the duties of [her] office." (Article V, § 18(d)(1) Pa. Const.);

— when the judge fails to dispose of truancy cases for as many as 116 days she is not "devoting the time necessary for the prompt and proper disposition of the business of [her] office" (Rule 3A.); and she is "neglecting and failing to perform the duties of [her] office." (Article V, § 18(d)(1) Pa. Const.);

**5.** Justices of the peace are now called magisterial district judges.

— when she fails to sign the numerous papers she is required to sign in the ordinary business of her court and permits a large backlog to accumulate, she is not "devoting the time necessary for the prompt and proper disposition of the business of [her] office" (Rule 3A.); and she is "neglecting and failing to perform the duties of [her] office." (Article V, § 18(d)(1) Pa. Const.).

One more thing with respect to Rule 3A.: Respondent appears to think—or to have thought in 2009—that, inasmuch as magisterial district judges are required to run for election, they are—or should be—allowed to walk away from their district courts in order to conduct their campaigns. A glance at pages 8, 9, 10 and 12 and 13 of Board Exhibit 1 confirms this—those pages show all the days in 2009 she called off leading up to the May primary election and the November general election. See, also, her testimony on cross examination:

Q. Judge, with regard to your campaign, you felt that you weren't able to perform your judicial functions and campaign for reelection at the same time; isn't that right?

A. I felt that my campaign required me to pay attention to it during the daylight hours.

Q. Is that true for weekends that you weren't on weekend duty?

A. No. During the week, I felt, yes, I needed to campaign during the week, and with it being in March and April and in October/November, yes, I felt I needed to campaign during daylight hours.

Q. And you don't feel that a judge who campaigns during daylight hours, when they should be in court, is not neglecting their judicial duty?

A. I don't agree with your question. We're elected officials. We should be permitted to campaign. (N.T. 561–62).

■ However strong Respondent's opinion on the subject might be, there is only one thing she, as a magisterial district judge, needed to know, and that is that Rule 3A. does not permit campaigning—or anything else—if it is allowed to take priority over "the prompt and proper disposition of the business of her office," which Respondent's election campaigning certainly did.

We find that the Board has established by evidence clear and convincing that Respondent's conduct constitutes a violation of Rule 3A. of the Rules Governing Standards of Conduct of Magisterial District Judges as well as of Article V, § 18(d)(1) of the Pennsylvania Constitution due to Respondent's neglect and failure to perform the duties of her office.

■ 5. We now address the fifth and last charge that the Board makes relative to Respondent's lateness and absences, i.e., that the conduct constitutes a violation of Rule 5A. of the Rules Governing Standards of Conduct of Magisterial District Judges.

Rule 5A. provides:

Magisterial district judges shall diligently discharge their administrative responsibilities, maintain competence in judicial administration and facilitate the performance of the administrative responsibilities of their staff and of other members of the judiciary and court officials.

Rule 5A. required Respondent to do three things:

1. diligently discharge her administrative duties,

2. maintain competence injudicial administration, and

3. facilitate the performance of the administrative responsibilities of her staff.

We have already found that Respondent did not diligently discharge her administrative responsibilities, a violation of Rule 5A.

We have no reason to believe she is not competent to perform her administrative duties, nor is there any evidence that would establish that—she just didn't perform them when she should have.

The testimony set forth above amply demonstrates that her latenesses and absences, far from "facilitating" the performance of the administrative responsibilities of her staff, did the exact opposite, which is, of course, a violation of Rule 5A.

## B. TRUANCY CASES

### Findings of Fact

25. William Allen High School had an enrollment of 3,600 students, a serious truancy problem and was located in this Respondent's jurisdiction; as a consequence Respondent handled a large number of truancy cases. For many years her court scheduled truancy cases two full days a week; at some point that became one full day a week. (N.T. 223, 227–32 Falko; 364–66 Arcelay).

26. In cases where the truant student and his or her parents did not appear in court for the scheduled hearing (known as "no-show cases" or "no-shows") Respondent would meet with Suzette Arcelay, the school district representative after the completion of the hearings, identify the "no-shows," and Respondent would impose a fine *in absentia*. In 2009 Respondent departed from this procedure and did not dispose of the no-shows at the end of the

day. She would tell Mrs. Arcelay that she would do it later. (N.T. 391–92 Arcelay).

27. In 30 cases, all occurring in 2009, Respondent delayed adjudications of no-show cases as follows:

6 days—4 cases

13 days—6 cases

27 days—5 cases

34 days—3 cases

116 days—12 cases

(N.T. 394–95; Board Exhibit 9). (Stipulated).

28. This caused a serious problem for the school district because in these cases the students who were already truant, had been cited for their truancy, elected not to show up for court and suffered no consequences, would continue to be truant until sentence was imposed. (N.T. 446–48 Welle–Feldman).[6]

### Discussion

■ We set down here samples of the testimony which leads us to make Findings of Fact 25–28, in addition to Board Exhibit 9 to which the parties stipulated.

Referring to truancy hearings, Suzette Arcelay testified:

Q. At the conclusion of these hearings, how would Judge Merlo render her decisions?

A. She would either continue them or give them a fine.

Q. Now, were there instances where a defendant wouldn't show?

A. Yes.

Q. What was her practice in those instances?

A. At the beginning, when she first took office, we would—once the— well, we would call the no-shows. We would convene after all the

---

**6.** The Board also charged that Respondent made *en masse* adjudications in truancy cases. This charge was not supported by the evidence.

hearings. We would meet and she would give me the information. But if they had service, then she would give me a fine in absentia, basically, where she would make her decision at the end of all the hearings, and the end of the day.

Q. Did a problem arise with these no-show dispositions between Judge Merlo and the school district?

A. Then it got to the—to the point where she would—Judge Merlo would say that she was tired or if she wanted a cigarette and she would say she would give me the information the next day or whenever she got a chance to do them. (N.T. 391–92).

During Mrs. Arcelay's testimony the following discussion took place on the record:

MR. KLEMAN: I have, for the Court's consideration, a packet of materials of delayed dispositions in no-show cases that counsel has stipulated to . . . . .

MR. STRETTON: I have no problem admitting them as to authenticity and whatever relevance they have. I would like a copy of them.

JUDGE MORRIS: They are offered and admitted.

(Whereupon, Board Exhibit 9, was admitted into evidence.)

MR. STRETTON: These are her records, Judge Merlo's court records. I certainly can't dispute those.

JUDGE JAMES: Do we have a tally on those? How many cases are we talking about?

MR. KLEMAN: Thirty cases, Your Honor.

JUDGE JAMES: Thirty cases. Thank you. (N.T. 394–95).

Patricia Welle–Freeman testified:

Q. The Court has heard some testimony from Suzette Arcelay in regards to no-show cases. Could you describe what a no-show case is?

. . . .

THE WITNESS: Are we talking about Merlo's not showing up?

BY MR. KLEMAN:

Q. Yes—no, no, no. We're talking about when the student fails to show—

A. For a—.

Q. —for a truancy, or the defendant in a truancy citation fails to show—

A. Uh-huh.

Q. —in Judge Merlo's court, what was the problem with Judge Merlo's handling of those cases from the school's position?

A. Well, a lot of cases are continued and they are continued repeatedly and because of that, there are significant delays. When we have kids who don't show up for court, they're already truant. When a case is continued, that student now has an opportunity for another four to six weeks of school absence. By the time anyone actually addresses something, that student could be out of school for 40–60 or more days. (N.T. 446–48).

Respondent's explanation that she frequently delayed adjudications in order to give kids a second chance hardly explains the delay in cases where the truant failed to appear for a first chance.

It should also be mentioned that Respondent's previously described work habits had the predictable deleterious effect upon the truancy cases. As testified to by Ms. Welle–Feldman, it set a poor example for students charged with absence and tardiness to be summoned to court where the

judge was absent or tardy.[7] At one point, Ms. Welle–Feldman met with Respondent to discuss these problems, but was rebuffed.[8]

Similarly, Respondent's courtroom demeanor problems (addressed below) were evident in her handling of truancy matters. Mrs. Arcelay described erratic and rude behavior including an occasion when Respondent told Mrs. Arcelay to "shut up." [9]

We find Respondent's conduct set out above to be a violation of Rule 3A. of the Rules Governing Standards of Conduct of Magisterial District Judges and of Article V, § 18(d)(1) of the Pennsylvania Constitution as the conduct constitutes neglect or failure to perform the duties of office.

Further discussion would be redundant, for one need only hear the testimony and read the rule and the constitution and it is clear the conduct violates both. The facts are stipulated; the legal conclusion is unavoidable. The damage to the school district's efforts to deal with truancy in its schools resulting from Respondent's neglect of her duties is eminently predictable.

## C. *LANDLORD/TENANT CASES*

### *Findings of Fact*

29. Rule 512 of the Rules of Civil Procedure for Magisterial District Judges applies in so-called "Landlord/Tenant cases" where the action is one for the Recovery of Possession of Real Property. That rule, in pertinent part provides:

A. The plaintiff must appear at the hearing and present testimony in an action for the recovery of possession

of real property. (Board Exhibit 14).

30. Respondent gave standing instructions to her staff on how they were to handle landlord/tenant cases where recovery of possession of real property is sought, on any days when Respondent is absent from court. The instructions covered three situations:

1. cases where the landlord was present and the tenant was not,
2. cases where both the landlord and tenant were present and they agreed as to what the plaintiff was seeking, and
3. cases where both the landlord and tenant were present but they disagreed as to what the plaintiff was seeking.

In the first two situations the staff would enter judgment on the Notice of Judgment form and mail it to the parties right away or, in any case, no later than the next day. This Notice was not signed by Respondent.

In the third situation the case would have to be rescheduled for another date. (N.T. 94–104 Wenhold; 160–63 Stringer; Board Exhibits 1, 4–7).

Office manager Wenhold testified as follows:

Q. What staff members of Judge Merlo's court worked on landlord/tenant cases for her?

A. All of us.

Q. Yourself included?

A. Yes.

---

7. N.T. 440 Welle–Feldman.

8. N.T. 444 Welle–Feldman.

9. It did become clear that a portion of the problems between Respondent and the school

district resulted from the latter's view that a judge's role should be to simply affirm the district's conclusion of truancy. However, this does not alter our evaluation of the objective evidence.

Q. What occurred when Judge Merlo was absent on a day scheduled for landlord/tenant hearings?

A. At the time of the landlord/tenant hearing, one of us would approach the counter and have the parties involved in the case approach the counter. And if only the landlord was there, we'd verify that the information on the complaint was correct and write up a note on the worksheet judgment for the plaintiff. If the defendant was there and they agreed to what the plaintiffs were seeking, we would also write up a note on the worksheet for judgment for the plaintiff. If the defendant was there and disagreed, then we would reschedule the hearing for another date when it could be heard in front of the judge.

Q. Now, when you say that you wrote on the worksheet, what is the worksheet?

A. It's a form that our computer generates where there's boxes to check for which parties were present, spaces to fill in the rent in arrears, damages, anything like that that they feel where a judgment—boxes to check whether or not possession was granted and a space at the bottom for the judge to sign.

Q. Now, when Judge Merlo was absent, you had described the procedure that you took.

A. Uh-huh.

Q. Was that based on a standing instruction from Judge Merlo?

A. Yes. (N.T. 94–95).

Office manager Stringer, who preceded Ms. Wenhold in that job, testified:

Q. Did you assist Judge Merlo if she was handling landlord/tenant cases?

A. Yes.

Q. What instructions did Judge Merlo give to the staff as to handling the landlord/tenant cases?

A. She told us to enter the judgment when she wasn't there.

Q. Would you care to elaborate on that?

A. Well, if the defendant—if plaintiff came and the defendant wasn't there, we entered judgment. And if there were two parties there, I always made the plaintiff and defendant, if they were in agreement that they owed the money, I made them sign the complaint, the plaintiff and the defendant, and date it. If they were not in agreement, it had to be continued. (N.T. 160).

The Board has charged that Respondent's conduct described in landlord/tenant cases above was a violation of four separate rules of conduct and constitutional precepts, each of which furnishes the basis for the imposition of discipline by this Court. In *In re Eagen*, 814 A.2d 304, 306–07 (Pa.Ct.Jud.Disc.2002), this Court said:

While the Board may have felt it necessary and appropriate to characterize the same conduct of Respondent seven different ways so as to charge him with all potential ethical violations, we consider it unnecessary for this Court to address all seven counts included in the Complaint. This is particularly true since the violation charged in Count 7 is plain on its face. Unlike a criminal case in which the range of penalties is determined by the number of charges and the statutory sentence mandated for each offense upon which there is a finding of guilt, the scope of sanctions available to this Court is not so circumscribed. Any finding by this Court that a judicial officer has violated the Constitution of Pennsylvania or the Code of Judicial Conduct subjects that judge to the full

range of appropriate discipline. Furthermore, in exercising our discretion in imposing disciplinary sanction, we are guided not by the number of ways the Respondent's conduct has offended the Constitution or Code, but, by the nature of the conduct itself and any mitigating or aggravating circumstances. Accordingly, since it is beyond reasonable dispute that the Board has proven Count 7 by clear and convincing evidence, we decline to address the remaining charges which, if proven, would be merely cumulative.

In this case, it is beyond reasonable dispute that the Board has established a violation of Rule 4A. (Count 3) by clear and convincing evidence and so, as in *Eagen*, we decline to address the remaining charges, which, as in *Eagen*, if proven, would be merely cumulative.

Insofar as pertinent here, Rule 4A. provides:

> Magisterial district judges shall be faithful to the law and maintain competence in it.

We are not convinced that Respondent is not competent in the law; but we are convinced that she was not faithful to it. The law—Rule 512—requires her to hold hearings in landlord/tenant cases where recovery of possession of real property is an issue;[10] but she didn't hold hearings.[11] Two judicial colleagues—called by the Respondent—were clearly aware of the rule, each testifying that "there are no default judgments in landlord/tenant cases." Re-

spondent was therefore, not "faithful" to the law. That is a violation of Rule 4A. and we so hold. It is worth noting that Respondent's short-cut procedures are the obvious product of the absenteeism discussed above.

### D. DEMEANOR AND ABUSE OF POWER

The Board presented evidence of Respondent's conduct during 10 cases she heard in her court. Additionally, two members of Respondent's staff testified on the issue of demeanor.

We find that in six of the cases, *Commonwealth v. Krauss, Commonwealth v. Parrales, Commonwealth v. Renninger, Alcaro v. DeCesare, Commonwealth Steinbrecher,* and in the case about which Assistant District Attorney Bethany Zampogna testified,[12] (hereinafter the Zampogna case), the Board established by clear and convincing evidence that Respondent's conduct occurred as the Board's witnesses testified and constitutes in each case a violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges.

In three of the cases, *Commonwealth v. Rozak, Commonwealth v. Alvarez* and *Commonwealth v. Berrios,* we find the evidence is not clear and convincing to establish that events occurred as the Board contends and therefore we find no violations.

---

**10.** There is a reason for this: the Landlord and Tenant Act requires that specified notice be given to the tenant in specified circumstances if eviction is in the picture. Also the Act provides that notice can be waived in specified circumstances in specified ways. A hearing is required so that the judge can determine that the notice given or the waiver made were in compliance with the law. *See* 68 Pa.S.A. § 250.501.

**11.** Respondent never denied this—she thought that hearings were not required in these cases, that it was alright to enter "default judgments." Later in the trial she admitted she made a mistake. (N.T. 552–53).

**12.** This was a criminal case but the name of the defendant is nowhere in this record.

In one case, *Commonwealth v. Mercado*, there was no dispute over what Respondent's conduct had been—Mr. Mercado was in front of Respondent for a $150 parking ticket; he told Respondent that it would probably change his life if he married his girlfriend and Respondent told him that if he did that she would remit the fine.[13] This little episode is like many others occurring in courtrooms all around the Commonwealth—it is an example of a judge giving somebody "a break" where it is expedient to do so. It is not violative of any ethical principle which has been promulgated in this Commonwealth,

Next we discuss the *Rozak, Alvarez* and *Berrios* cases where we find the evidence to be less than clear and convincing to establish that Respondent's conduct was as charged by the Board.

### Commonwealth v. Rozak

Rozak was brought before Respondent because of unpaid parking tickets. Rozak told the Respondent that he had paid the tickets and had posted collateral with the Parking Authority. The records Respondent had from the Parking Authority did not show that. In an effort to get to the bottom of it Respondent called the Parking Authority to find out if and how much Rozak had paid the Authority and where the money was. She was connected to one Cathy Sterner. The call was put on speaker phone so those in the courtroom including Respondent, Kim Decker, a member of Respondent's staff, Constable Carlos Bernardi, and Rozak heard some or most of what was said. The question before us is: was Respondent rude and demeaning to Ms. Sterner, or not?

Sterner said she was.[14]

Merlo said she wasn't.[15]

Decker said she was "quite stern and kind of harsh." [16]

Constable Bernardi, who brought Rozak to court, said Respondent was persistent in seeking an explanation from Sterner and Sterner got "a little bit irritated" but that Respondent was not rude and did not belittle or yell at Ms. Sterner.[17]

Rozak said that Respondent was explaining the circumstances to Sterner, that Respondent's "tone of conversation . . . wasn't irate or wasn't raised. It wasn't anything." He testified that "the lady from the Parking Authority . . . was just very rude on the phone to the judge." [18]

There is no doubt the issue arose out of Respondent's frustration because of her inability to get a satisfactory explanation from Sterner, and Respondent may have raised her voice as her frustration became elevated; but the evidence is not clear and convincing that Respondent was discourteous, rude or impatient with Ms. Sterner in violation of the Rules Governing Standards of Conduct of Magisterial District Judges or of any constitutional standard.

### Commonwealth v. Alvarez

In the *Alvarez* case, the evidence establishes that Rebecca Alvarez was a student at William Allen High School who was charged with disorderly conduct in the course of a "run-in" with another student. The case came before Respondent and was "prosecuted" by one Sergeant John Guido, a school policeman, curiously called a School Resource Officer or "SRO." Guido

13. N.T. 856–65 Solomon; 950–51 Merlo.

14. N.T. 797–812 Sterner.

15. N.T. 934–45 Merlo.

16. N.T. 821 Decker.

17. N.T. 1079–83 Bernardi.

18. N.T. 1058–61 Rozak.

did not witness the incident and produced no witness who did. Respondent found Alvarez not guilty. This finding did not coincide with the sergeant's concept of justice so he asked the judge: "What's your reason?" [19] The evidence seems to indicate that Guido persisted in his demands that Respondent give him a reason and that eventually Respondent told him the reason was "insufficient evidence" and told him to "get out." [20] Although Respondent and Sgt. Guido gave varying renditions, it is clear that each was frustrated with the performance of the other. The testimony, however, leaves us unable to conclude that Respondent committed any violation in this case.

### Commonwealth v. Berrios

■ This case involved a feud between two neighbors. It had been going on for some time and the whole neighborhood had become involved. There had been numerous police contacts leading to various cases in Respondent's court. The mayor of Allentown had appointed a man named Nicholas Butterfield, an experienced mediator, to resolve the problems. He testified that he had conducted a successful mediation and was present at the Berrios hearing as an observer. Mr. Butterfield testified that Respondent delivered a 20 minute "diatribe" at the hearing—directed at one of the parties. He felt that Respondent's words had been "humiliating," "aggressive" and "angry." [21]

In her testimony Respondent described a contentious hearing in a crowded courtroom during which a number of disputes had to be dealt with, one, involving a film from a security camera, in particular.

During this testimony Respondent was addressed from the bench as follows:

JUDGE MORRIS: Judge, here's the point. Mr. Butterfield says he was there. He was not very specific about anything that was said that was involved. He said there was a 20–minute diatribe from you. What I get from your testimony is there might have been an extended discussion as to who had and who should produce a tape, and that you're saying that he has mistaken this go around about this DVD with a 20–minute diatribe.

... that seems to be the story that Mr. Stretton's attempting to produce. Is that correct, Mr. Stretton?

MR. STRETTON: Yes. [22]

We mark Mr. Butterfield as a truthful man, and he is no stranger to courtrooms. [23] On the other hand we don't know when, to him, spoken words become a "diatribe." We also think there might be something in Respondent's testimony that bears consideration. She testified:

THE WITNESS: Mr. Butterfield was disturbed that I would not let him testify. He was assigned by the mayor to resolve this case. The mayor gave him access to confidential police information regarding exactly who called. Mr. Butterfield said that he wanted to give a full report to all of those assembled about his review of the confidential police files that he reviewed, and then he would consider the matter over. I was stunned. I told Mr. Butterfield that wasn't proper testimony, and I ended the matter with him by talking about how unless he had some direct personal firsthand knowledge that I don't see

---

19. N.T. 666 Guido.

20. N.T. 664 Guido.

21. N.T. 900–01 Butterfield.

22. N.T. 967–68 Merlo.

23. N.T. 894–95 Butterfield.

that he has any testimony that would be relevant today. He didn't like the ruling and didn't accept the ruling and said, no, but I know these things. And everyone's here. I want to give a full report.[24]

Maybe it was a "diatribe"; but we were not there; we have only the evidence in this record upon which to base our decision, and we find that evidence is not so clear and convincing as to lead us to hold that it is of the quality required by the Constitution and therefore we find no violations.

We will now address the other six cases; but before we do, we point out that the Board has charged that the Respondent's conduct in each of the 10 cases constitutes a violation of six separate rules and constitutional provisions. Since Respondent's conduct in each of the six cases is a clear violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges, we decline to address the remaining charges which, if proven, would be merely cumulative. This is in accordance with our treatment of the multiple charges filed by the Board in the landlord/tenant cases.

We turn now to discuss each of the six cases.

### Commonwealth v. Krauss

In this case the defendant, Andrew Krauss, was a senior in high school and came before Respondent charged with speeding. The arresting officer had agreed to lower the charged speeding level; the young man agreed to plead in accordance with that arrangement; and Respondent was so advised. Respondent then told the defendant's mother, who was with him in the courtroom that she "would need to talk to her boy directly about the matter before agreeing to the disposition.[25] Respondent then did speak to Andrew Krauss. She began by telling him he was "a dog and a dog needs to be retrained.[26] She then entered into a lengthy vocal exercise covering such topics of being away from his mother, drinking and other likely temptations he could expect to confront in college, women keeping men waiting while they put on their jewelry, and how she likes to wear rings on all her fingers, etc. This all is Respondent's testimony, except that she denied that she liked rings on her fingers and denied making any reference to a dog.[27]

We mentioned earlier that credibility would play prominently in our resolution of these matters. This is an example. We believe Mrs. Krauss. In her testimony she described Respondent's monologue in the courtroom as follows: "My complaint is she rambled on a flight of ideas making no sense at all for 10, 15 minutes, instead of focusing on the matter at hand." [28] Inasmuch as this is exactly how we would describe Respondent's testimony in this case, that of itself is clear and convincing evidence that that is how she spoke to Andrew Krauss in the underlying case. Moreover insofar as there are any conflicts between Respondent's testimony and Mrs. Krauss's we resolve those conflicts in favor of the latter. Specifically, for example, we find the evidence that Respondent compared Andrew Krauss to a dog to be clear and convincing. So, also do we find with respect to the testimony that Respondent spoke of how she liked rings on her fin-

24. N.T. 968–69 Merlo.

25. N.T. 919 Merlo.

26. N.T. 771 Deborah Krauss.

27. N.T. 920–26 Merlo. See, also, N.T. 767–83 Deborah Krauss.

28. N.T. 782 Deborah Krauss.

gers—it is extremely unlikely that Mrs. Krauss's imagination is that creative. We find the Board has established by clear and convincing evidence that Respondent's conduct in the *Krauss* hearing to be such that violated Rule 4C.

### Commonwealth v. Parrales

 This was a case of domestic assault. The prosecuting witness, Sujeily Rodrigues, retained David Nicholls as her attorney who advised her that she should exercise her right to decline to testify under the Fifth Amendment. The preliminary hearing was held before Respondent. Ms. Rodrigues was called to testify by the district attorney. Ms. Rodrigues spoke Spanish but not English. There was an interpreter present. Attorney Nicholls described the proceedings as follows:

Q. Was she called to testify?

A. She was.

Q. Please explain what happened.

A. I believe the district attorney asked some basic questions, name and address, relationship with the defendant. After we got past those basic questions, there was a question posed regarding the statement that she had made or I think the question was did you make a statement? At that point I attempted to assert her Fifth Amendment rights and so did she.

Q. "So did she," meaning—

A. The witness herself.

Q. Your client?

A. Correct.

. . . .

Q. So there came a point in the proceeding when you asserted the Fifth Amendment on behalf of your client?

A. Correct.

Q. What was the judge's reaction?

A. The judge questioned whether or not she had the ability or the right to do that. In fact, when my client refused to testify, she began thumbing through some materials—

Q. "She" meaning—

A. The judge—

Q. Judge Merlo?

A. —saying I'm looking to see if I can find a way to charge her with perjury. I then began a dialogue with the judge indicating I thought, respectfully, that I didn't think she had the authority to do that. If she was going to be charged with perjury, she'd have to testify first. And, you know, there was some back and forth between myself and the judge over an extended period of time as to whether or not she had the right to assert this privilege, and I was pretty adamant that she did.

Q. You were asserting you legal position?

A. Yes.

Q. The judge was—there was give and take between the two of you? Describe it in your words.

A. The judge became angry that she was unable to get my client to testify. I believe it was the judge's position to let her testify and see what she says before we decide whether or not she can assert the privilege. I mean, that was the gist of it. She also wanted my client to assert the privilege herself. My client is someone with a limited educational background, didn't speak very good English, was communicating with the judge through the interpreter. And, you know, it was difficult for her to find the exact words, but it was clear that she indicated she did not want to testify.

Q. Given all that that you've explained, what action did you take?

A. Well, I continued to counsel her not to testify. At some point Judge Merlo ordered that I was no longer allowed to speak to my client.

Q. Wait a minute. She told you or she ordered that you could not speak to your own client?

A. She told me to shut up.

Q. Those were her words?

A. Those were her exact words, several times.

Q. What was the judge's body language and demeanor at this point in time?

A. She was angry, and at some point she simply sentenced her to—she found her in contempt and sentenced her to ten days in jail and asked the sheriff to immediately arrest her.

Q. To arrest your client?

A. Correct.

Q. What was the reaction of the sheriff's personnel?

A. They refused to arrest her.

Q. Notwithstanding Judge Merlo's edict or order to them?

A. They refused to comply with her request.[29]

Nicholls appealed Respondent's contempt order to common pleas court. Respondent filed Findings of Fact[30] and the matter was heard by Judge Steinberg who vacated the contempt order. Respondent provided no rational explanation for her contempt ruling and—as in several other cases discussed herein—she flatly denied telling anyone to "shut up."[31]

We find that what happened at the preliminary hearing is what Attorney Nicholls said happened. We find Respondent's testimony to be absurd, and in no way a justification for holding Nicholls's client in contempt—which she did. We find Respondent's conduct in this case to be outrageous and certainly a violation of Rule 4C.

### Commonwealth v. Renninger

 The defendant in this case was being held in the Lehigh County Prison on a charge of criminal mischief, a summary offense. The Central Booking Center is located in the prison and is run by Michael Rooney. In Lehigh County, arraignments for incarcerated defendants are held in Central Booking by video. Michael Rooney testified that Respondent called Central Booking to advise that she wanted to speak to Mr. Rooney, so Mr. Rooney was brought into the video room and placed in front of a camera and Judge Merlo activated the video system. Rooney testified:

A. And I heard Judge Merlo say, "Okay. We're going to start the summary trial now." And I kind of, like, took a double take and I kind of, like, thought, you know, "What are we doing?"

Q. Why? Why'd you think that?

A. Because I've never seen a summary trial occur, and that's not what Central Booking is for.

. . . .

JUDGE MORRIS: And are there arraignments on summary cases?

THE WITNESS: The only time a person would be arraigned on a summary case is if they didn't have an address or there was, like, other circumstances, like the gentleman had a detainer—or the defendant had a de-

---

29. N.T. 873–77 Nicholls.

30. Respondent's Exhibit 1.

31. N.T. 993 Merlo.

tainer on them, then we would arrange for an arraignment. But other than that, they—summaries are not arraigned.

JUDGE MORRIS: So why was he brought out?

THE WITNESS: We were told that the judge wanted to speak to him.

JUDGE MORRIS: Okay.

BY MR. MASSA:

Q. I believe you had stated that you were processing some paperwork and something drew your attention to what was unfolding on the video camera relative to Renninger and Judge Merlo?

A. Yes. Judge Merlo stated that we were going to start the trial, the hearing, and at that point, I looked at the camera because I've never seen that before, and—Judge Merlo got up and she adjusted her camera towards, if you would, the gallery, I guess you would call it. There was a few chairs in the courtroom.

Q. In her courtroom? The gallery in her courtroom?

A. Yes. And there was a gentleman sitting there, a police officer, I found out later on, and a female. And she proceeded to swear them in, made them, you know, raise their right hand and swear them in.

Q. Did either one of them "testify"?

A. The police officer did not testify. The lady, the female, did.

Q. What was Renninger's reaction?

. . . .

A. And the defendant, Mr. Renninger, was getting very upset. He said—he kept interrupting. He said, "Judge, you know, this is not fair. You know, I have a right to present witnesses that I have. I have evidence. I have a videotape from CVS. You know, I

can't do that." And Judge Merlo kept interrupting him and saying, "Sir, Mr. Renninger, we're going on with this trial right now. You know, stop talking." And Mr. Renninger starting getting more and more upset. And he started saying, "Judge, this is not fair. This is not right. I know the system. I know I have a right to call witnesses. I can't do that here." And this continued on for probably three minutes.

Q. Was Renninger asserting his right—his rights as he viewed them?

A. Yes, and that's all he was doing.

Q. Calling witnesses?

A. That's all he kept saying. He said, "Judge, I have a right to call witnesses. Judge, I have a witness. I have a witness that can testify on my behalf in this case. I can't call him when I'm in prison. I had no idea we were proceeding with this today."

. . . .

Judge Merlo then stated, "Mr. Renninger, if you interrupt me again, I'm going to interrupt you to see how you like it." And Mr. Renninger said, "Judge," and Judge Merlo started saying, "Rover has a bone. Rover has a bone. How do you like it Mr. Renninger? How do you like it when you're interrupted when I'm trying to speak?" And Mr. Renninger said, "Judge, I just want to let you know I have a witness." "Rover has a bone." And as she's doing it, she's—"Rover has a bone, Rover—how do you like it, Mr. Renninger? How do you like it?"

Q. Now, you are demonstrating, waiving your head around and your eyes pointing towards the ceiling?

A. That's exactly how she did it.

Q. You're demonstrating what you saw?

A. Yes.

Q. How many times would you estimate she said, "Rover has a bone"?

A. Fifteen. Every time Mr. Renninger would ask to have his witnesses present, she would interrupt him and say, "Rover has a bone. Rover has a bone."

Q. I'll ask the obvious. What was your reaction to that unfolding?

A. I—I was stunned. And I was—at this point, Mr. Renninger was getting more and more upset, and now my concern was I wanted to calm him down because, obviously, if he would have gotten to the point where something would have happened, then I would have had to control him.[32]

At the conclusion of the "trial" Rooney immediately called Gordon Roberts, the magisterial district judge's administrator, to report this incident.[33] After his telephone conversation with Mr. Roberts he prepared a report of the Respondent's behavior as set out above.[34]

As in the *Parrales* matter, Respondent's conduct in holding a long distance trial for an unprepared, unrepresented defendant constitutes an appalling violation of basic legal principles all to the accompaniment of bizarre incantations of "Rover has a bone." Although Respondent admits that she should not have held a trial, she denies the incantations. However, Rooney's testimony is thoroughly corroborated by Detective Stephen Milkovits who had arrested Renninger and was in Respondent's courtroom during the "video trial."[35]

Accordingly, we find the Board has established by clear and convincing evidence that Respondent's conduct in the "trial" of Preston Renninger to be a violation of Rule 4C.

### Alcaro v. DeCesare

 Mark Alcaro is a young man whose job requires him to deliver blood to the Philadelphia Airport, has an "occasional DJ gig" and an "emerging cognitive therapy practice in Philadelphia." He has a bachelor's degree in psychology from Rutgers University.[36] He and his wife were plaintiffs in a case before Respondent where they sued their landlord for return of their security deposit. Alcaro's difficulty in serving the landlord became an issue at trial. Alcaro testified:

A. After I said that I had a recording of her office telling me that she was dodging service, the defense attorney objected, and she immediately said, "Objected [sic] sustained," but she's asking me, "Do you have that with you"? And I said, "Yes, it's a voicemail on the phone." And she said, "I want you to play it." And, again, the defense objected. And she said, "Don't worry, it's not admissible, but I want to hear it."

---

32. N.T. 617–24 Rooney.

33. N.T. 625–26 Rooney.

34. See Board Exhibit 18.

35. Rooney's and Milkovits's testimony was contradicted by Arlicia Ingram who was the "victim" and the witness at the "video trial" insofar as she testified Judge Merlo acted "courteously" at all times and that she never heard Respondent say the words "Rover has a bone." Here again does credibility "walk upon the scene" (See "Accentuate the ·Positive," Harold Arlen and Johnny Mercer, 1944), and here we are quite comfortable finding that Rooney and Milkovits are eminently credible and, even if there happened to be some doubt about that, we can't imagine either of them making up a story like this. At the same time we are equally comfortable finding that Ms. Ingram wasn't watching or listening to the judge at the "trial"—or she forgot.

36. N.T. 677 Alcaro.

Q. Did you play it?

A. Yes, I did. I placed my phone on speakerphone and I played it out loud in the court for whoever was there to hear it.

Q. Go ahead.

A. After I finished the recording, the judge had an extreme reaction. I apologize to the Court if this term offends you, but the best term I can come up with is she went "ape shit." I mean, she started screaming at me and she said, "You were sitting under a sign out there saying we can't comment on cases. You should know better than to bring that into my court and play it. It's quarter to 4:00 on a Friday. Why are you wasting my time with this stuff?"

. . . .

I sat there and she screamed at me for probably five minutes. And I was trying to interject, trying to explain myself, and she just kept cutting me off. And I eventually just sat with my hands crossed and took my beating, because I knew there was nothing else I could do. I have been to Catholic school; I was raised in an Italian–American household; I was a high-spirited youth; I worked the credit counter at Sears for a few years; I tended bar in North Jersey and Los Angeles for years; and never in my adult life has any professional addressed me that way. I wouldn't let my mother speak to me that way.[37]

Asked how he felt as he left the courtroom, judgment having been entered in his favor, Alcaro's response was:

A. I have been to court a number of times, again, high-spirited youth,

been to Traffic Court, I've been fined, I've paid hundreds of dollars in surcharges, I've had my license suspended for months at a time, and I never left a courtroom feeling worse than I did the day I won in Judge Merlo's court. (N.T. 699).

Respondent testified that she does not remember Mr. Alcaro ever being in her court. She remembers Mrs. Alcaro but not Mr. Alcaro.

We find that the Board has established by clear and convincing evidence that Respondent's conduct during the *Alcaro* hearing constitutes a violation of Rule 4C.

### *Commonwealth v. Steinbrecher*

The defendant in this case had a mental health or substance abuse issue and was incarcerated. He was represented by Attorney Dermis Dougherty. Dougherty had an agreement with the district attorney that his client would waive the preliminary hearing and make a motion for modification of bail to permit his client to be admitted to an unsecured impatient treatment facility, Mr. Dougherty testified clearly and convincingly that when he presented that motion, Respondent "went off into a tirade" and said to the defendant "You're a low life and now you want bail, and I'm not going to grant you bail unless you tell me that you're a scumbag."[38]

Respondent denied that she ever used the word scumbag at the hearing but said the defendant volunteered that he was a scumbag.[39] Respondent's testimony on this subject was tortuous and persistently evasive.[40]

---

37. N.T. 692–96 Alcaro.

38. N.T. 843 Dougherty.

39. N.T. 949 Merlo.

40. N.T. 945–50, 993–97 Merlo.

We find that the hearing proceeded as reported by Attorney Dougherty and we find this evidence is clear and convincing and that the conduct described constitutes a violation of Rule 4C.

### The Zampogna Case

 Bethany Zampogna is chief deputy district attorney supervising narcotics in Lehigh County. She appeared in Respondent's court representing the Commonwealth at a preliminary hearing. The prosecuting witness had not been notified and the hearing was continued. The defendant moved to reduce bail at which point Zampogna got into an argument with the judge relating to the amount of bail. The question we must decide is whether, during this argument, Respondent told Zampogna to "shut up" and whether she fined Zampogna $100 for "contempt of court." [41]

Zampogna says she did.

Respondent says she didn't.

Zampogna reported the incident to her boss, district attorney, Jim Martin, immediately after it took place.[42] Respondent never took any action in any effort to enforce a contempt order.[43]

We believe Zampogna's testimony and find that it is clear and convincing. The reasons we do include:

— We judge her to be a credible witness.

— On the other hand, we heard Respondent testify for hours on numerous issues and we do not give her high marks for credibility.

— Zampogna reported the incident to the district attorney immediately.

— We cannot imagine that Zampogna would "make up" this story.

— Zampogna joins the list of witnesses claiming that they were told to "shut up" by Respondent.

We find that Respondent's conduct described by Zampogna constitutes a violation of Rule 4C.

Finally, we heard testimony from members of Respondent's office staff. Ms. Stringer stated that Respondent was rude to her staff and frequently ridiculed them in public. Ms. Nonnemacher spoke of an event where Respondent unfairly and harshly criticized her. As with Mrs. Arcelay's complaint of rudeness and Ms. Decker's complaint of belittling behavior, we find the testimony to be consistent with and supportive of the testimony we have heard throughout the case. However, we find no need to conclude that these descriptions constitute separate violations.

### III. CONCLUSIONS OF LAW

1. The Respondent's conduct set out in Findings of Fact Nos. 5–24 is:

(a) a violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges, and

(b) such that brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

(c) a violation of Rule 3A. of the Rules Governing Standards of Conduct of Magisterial District Judges, and

(d) such that constitutes neglect or failure to perform the duties of her office, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution, and

---

41. Magisterial district judges do not have authority to hold attorneys in contempt or to impose penalties therefor. *See* 42 Pa.C.S.A. § 4137.

42. N.T. 587 Zampogna.

43. N.T. 574–75, 583–87 Zampogna.

(e) a violation of Rule 5A. of the Rules Governing Standards of Conduct of Magisterial District Judges.

2. The Respondent's conduct set out in Findings of Fact Nos. 25–28 is:

(a) a violation of Rule 3A. of the Rules Governing Standards of Conduct of Magisterial District Judges, and

(b) such that constitutes neglect or failure to perform the duties of her office, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

3. The Respondent's conduct set out in Findings of Fact Nos. 29–30 is a violation of Rule 4A. of the Rules Governing Standards of Conduct of Magisterial District Judges.

4. (a) The Board has established by clear and convincing evidence that Respondent's conduct in the course of the hearings held by Respondent in the cases of *Commonwealth v. Krauss, Commonwealth v. Parrales, Commonwealth v. Renninger, Alcaro v. DeCesare, Commonwealth v. Steinbrecher* and *Zampogna* was a violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges.

(b) The Board did not establish by clear and convincing evidence that Respondent's conduct in the course of the hearings held by Respondent in the cases of *Commonwealth v. Rozak, Commonwealth v. Alvarez, Commonwealth v. Berrios,* and *Commonwealth v. Mercado* was a violation of Rule 4C. of the Rules Governing Standards of Conduct of Magisterial District Judges.

5. For the reasons set forth in Conclusions of Law Nos. 1–4, Respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

### ORDER

AND NOW, this 17th day of October, 2011, it is ORDERED that Respondent, Maryesther S. Merlo, is hereby removed from her office as Judge of Magisterial District No. 31–1–02, and it is further ORDERED that said Respondent is hereafter prohibited from holding any judicial office in the Commonwealth.