58 A.3d 1

In re Maryesther S. MERLO, Magisterial District Judge, Magisterial District 31–1–02, Lehigh County.

**Appeal of Maryesther S. Merlo.**

Supreme Court of Pennsylvania.

Argued Sept. 11, 2012.

Decided Sept. 28, 2012.

1

2

4

Samuel C. Stretton, Law Office of Samuel C. Stretton, West Chester, for Maryesther S. Merlo.

James P. Kleman Jr., Joseph A. Massa Jr., Judicial Conduct Board of Pennsylvania, Francis J. Puskas II, PA Judicial Conduct Board, Warren, for Judicial Conduct Board.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice TODD.

In this appeal, we consider whether the Court of Judicial Discipline ("CJD") erred in permanently removing Lehigh County Magisterial District Judge Maryesther S. Merlo (hereinafter "Appellant") from judicial office. After careful consideration, we find the CJD's sanction is lawful under the circumstances of this case. Accordingly, we affirm.

## I. Background

In November 2003, Appellant, a licensed attorney, was elected as a magisterial district judge in Allentown, Pennsylvania. Appellant began serving her term in January 2004, and, at the conclusion of her first six-year term, she successfully campaigned for reelection in 2009. Her second term began in January 2010. On November 4, 2010, the Judicial Conduct Board ("Board") filed a seven-count complaint with the CJD, alleging Appellant violated various Rules Governing Standards of Conduct of Magisterial District Judges (the "MDJ Rules"), including MDJ Rules 2A,[1] 3A,[2] 4A,[3] 4C,[4] and

1. MDJ Rule 2A provides, in relevant part: "Magisterial district judges shall respect and comply with the law and shall conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

2. MDJ Rule 3A provides: "Magisterial district judges shall devote the time necessary for the prompt and proper disposition of the business of their office, which shall be given priority over any other occupation, business, profession, pursuit or activity."

3. MDJ Rule 4A provides, in relevant part: "Magisterial district judges shall be faithful to the law and maintain competence in it."

5A.[5] The complaint further alleged Appellant violated art. V, § 18(d)(1) of the Pennsylvania Constitution [6] by neglecting or failing to perform the duties of her office and by engaging in conduct which brings the judicial office into disrepute. On February 25, 2011, the Board filed a second complaint containing three new sets of factual allegations relating to violations alleged in the first complaint. The complaints were consolidated, and a three-day trial commenced on May 31, 2011. The CJD classified the extensive evidence presented by the Board into four categories: Work Habits; Truancy Cases; Landlord Tenant Cases; and Demeanor and Abuse of Power.

## A. Work Habits

At trial before the CJD, the Board introduced evidence of Appellant's chronic absenteeism and habitual lateness in appearing for court. Specifically, the Board introduced a chart detailing the dates Appellant "called off." Between September 12, 2007 and December 15, 2009, Appellant called off on

4. MDJ Rule 4C provides: "Magisterial district judges shall be patient, dignified and courteous to litigants, witnesses, lawyers and others with whom they deal in their official capacity, and shall require similar conduct of lawyers, of their staff and others subject to their direction and control."

5. MDJ Rule 5A provides: "Magisterial district judges shall diligently discharge their administrative responsibilities, maintain competence in judicial administration and facilitate the performance of the administrative responsibilities of their staff and of other members of the judiciary and court officials."

6. Section 18(d)(1) of Article V provides:
 (d) A justice, judge or justice of the peace shall be subject to disciplinary action pursuant to this section as follows:
 (1) A justice, judge, or justice of the peace may be suspended, removed from office or otherwise disciplined for conviction of a felony; violation of section 17 of this article; misconduct in office; neglect or failure to perform the duties of office or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute, whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law; or conduct in violation of a canon or rule prescribed by the Supreme Court.... Upon a final order of the court for suspension without pay or removal, prior to any appeal, the justice, judge or justice of the peace shall be suspended or removed from office; and the salary of the justice, judge or justice of the peace shall cease from the date of the order.

116 days, and took 49 days of vacation, thereby failing to report to work at all on 30% of the workdays during that period. In addition, it was established that, on the days Appellant did not call off, she was *never* on time. Rather, her customary arrival time at court was between 10:00 and 10:30 a.m., despite the fact that hearings were always scheduled to begin at 9:30 a.m., and lawyers and litigants therefore were kept waiting. One witness, a police officer, testified that, in light of the number of times he appeared at a scheduled hearing before Appellant, only to learn after he arrived that Appellant had called off, he made it a practice to call Appellant's courtroom prior to leaving his home. Despite this practice, he recounted at least one occasion when he was told Appellant would be there, but, upon arriving at the courthouse, learned she had called off.

The Board also presented testimony regarding the detrimental impact of Appellant's conduct on her staff, who often spent most of the morning making telephone calls to attorneys, litigants, and witnesses to advise them that their hearings were continued; preparing and mailing notices of new hearing dates; and attempting to placate angry litigants and witnesses. These activities interfered with the staff's ability to handle the regular, day-to-day business of the court. Deborah Stringer, Appellant's former office manager, testified that Appellant's excessive absenteeism caused a backlog of paperwork in the office, such that often cases were not closed in a timely manner; and criminal defendants were not promptly given credit for time served. N.T., 5/31/11, at 164–65.

## B. Truancy Cases

The Board next presented evidence regarding Appellant's handling of truancy matters which came before her. William Allen High School, which is part of the Allentown School District, is located in Appellant's jurisdiction. The high school had a serious truancy problem, and, as a result, Suzette Arcelay, the home school visitor for the district, was required to appear before Appellant two days a week for truancy

hearings,[7] where she would present documentation of illegal absences. Arcelay testified that she customarily arrived at court between 8:00 and 9:00 a.m. for hearings scheduled for 9:30 a.m., but that Appellant typically did not arrive until between 10:00 and 10:30 a.m. N.T., 6/1/11, at 367. Arcelay further testified that Appellant sometimes would call off on the day of the truancy hearings, calling in as late as 10:30 or 11:00 a.m., and the hearings would need to be continued, after the families were already present. *Id.* at 369. In fact, the school district received numerous complaints from parents who missed work in order to attend a child's truancy hearing, which ultimately was continued because Appellant failed to appear. As a result of receiving so many complaints regarding Appellant's absences and tardiness, Patricia Welle–Feldman, the student services coordinator for the Allentown School District, ultimately spoke with her supervisor, and they contacted the Lehigh County Court Administration Office, requesting reassignment of truancy cases to a different judge. *Id.* at 441.

The Board also introduced evidence of Appellant's procedure for handling truancy cases when she was in court. Prior to 2009, when a truant student and his or her parents did not appear for a scheduled hearing, Appellant would meet with Arcelay after the completion of the hearings, identify the "no-shows," and either continue the hearing or impose a fine *in absentia.* Beginning in 2009, Appellant changed her procedure, and no longer disposed of the "no-shows" at the end of the day. Rather, Appellant would tell Arcelay that she was tired, and that she would give Arcelay the information "the next day or whenever she got a chance to do them." *Id.* at 392.

The Board introduced evidence that, in 2009, Appellant delayed the adjudications of 30 truancy cases after the child did not report for the hearing as follows:

| 6–day delay | 4 cases |
|---|---|
| 13–day delay | 6 cases |

7. At some point, truancy hearings were reduced to one day a week.

| 27–day delay | 5 cases |
| 34–day delay | 3 cases |
| 116–day delay | 12 cases |

*Id.* at 394–95. Welle–Feldman explained that these delays caused serious problems for the school district because the students who were involved already had truancy problems, but suffered no immediate consequences when they chose not to report for their hearing, and the student would continue to be truant until sentence was imposed. *Id.* at 446–48. ("When a case is continued, that student now has an opportunity for another four to six weeks of school absence. By the time anyone actually addresses something, that student could be out of school for 40–60 or more days."). Thus, a student's record of truancy often was extended due to Appellant's failure to adjudicate the matters in a timely fashion. Moreover, unsurprisingly, Welle–Feldman testified that it set a poor example for students charged with truancy or tardiness to be summoned to court where the judge herself failed to appear, or appeared late, for the hearing. *Id.* at 440.

## C. Landlord/Tenant Cases

The Board next presented evidence of Appellant's practice for handling landlord/tenant cases. In an action to recover possession of real property, Rule 512 of the Rules of Civil Procedure for Magisterial District Judges [8] requires that the plaintiff, which may be either the landlord or the tenant, appear at a hearing and present testimony. The Board presented evidence that, notwithstanding Rule 512, Appellant gave her staff standing instructions on how they were to handle landlord/tenant cases when she was absent from court. First, in cases where the landlord was present and the tenant was not, or in cases where both the landlord and tenant were present and they agreed on the relief plaintiff was seeking, Appellant's staff was instructed to enter judgment on a Notice of Judgment form and mail it to the parties immediately, or by the next day. The Notice of Judgment was not signed by Appellant. In cases where both the landlord and tenant were

[8]. *See infra* note 16 and accompanying text.

present, but disagreed as to the relief plaintiff was seeking, Appellant's staff was instructed to reschedule the hearings for another date. *See* N.T., 5/31/11, at 160–63 (Deborah Stringer testimony); at 94–104 (Rebecca Wenhold testimony).

### D. Demeanor and Abuse of Power

Finally, the Board presented evidence of Appellant's conduct during ten separate hearings in her court, which, according to the Board, violated six separate rules and constitutional provisions. In one case, *Commonwealth v. Krauss*,[9] the defendant was a high school senior charged with speeding. The arresting officer agreed to lower the charged speeding level, and the defendant agreed to plead guilty. After Appellant was informed of the arrangement, she told the defendant's mother, who had accompanied him to court, that she (Appellant) would need to speak with the defendant before she agreed to the disposition. Appellant addressed the teenaged defendant as follows:

> She began telling him he was "a dog and a dog needs to be retrained." She then entered into a lengthy vocal exercise covering such topics of being away from his mother, drinking and other likely temptations he could expect to confront in college, women keeping men waiting while they put on their jewelry, and how she likes to wear rings on all her fingers, etc.

*In re Merlo*, 34 A.3d 932, 967 (Pa.Ct.Jud.Disc.2011) (footnote omitted) (quoting testimony of defendant's mother, Deborah Krauss, at N.T., 6/2/11, at 771). The CJD noted that the above was "all [Appellant's undisputed] testimony, except that she denied that she liked rings on her fingers and denied making any reference to a dog." 34 A.3d at 967. However, on these points, the CJD credited the testimony of the defendant's mother.

The Board also presented evidence regarding a preliminary hearing held before Appellant in a domestic assault case, *Commonwealth v. Parrales*. The prosecuting witness had

9. Neither the briefs, nor the opinion of the CJD, contain docket numbers for this matter, or the other five cases discussed herein.

retained David Nicholls as her attorney in the case; during the hearing, Nicholls advised the witness, who required an interpreter, to invoke her Fifth Amendment right and decline to testify. According to Nicholls, at that point, Appellant questioned whether the witness had a right to refuse to testify, and began looking through some papers, stating "I'm looking to see if I can find a way to charge her with perjury." N.T., 6/2/11, at 874. Nicholls stated that he believed his client had the right to assert her Fifth Amendment privilege, and continued to advise his client not to testify, at which time Appellant became angry, ordered Nicholls not to speak to his client, and told him several times to "shut up." *Id.* at 876. Eventually, Appellant held the witness in contempt, sentenced her to ten days in jail, and directed the sheriff to immediately arrest her. The sheriff refused to arrest the witness. On appeal, a court of common pleas vacated the contempt order.

In another case, *Commonwealth v. Renninger*, the defendant was confined in the Lehigh County Prison on a summary charge of criminal mischief. In such cases, arraignments for incarcerated defendants are conducted by video through the Central Booking Center, which is located in the prison. However, Michael Rooney, who runs the Central Booking Center, testified that when the defendant was brought into the video room, Appellant announced that she was going to start the summary trial, and proceeded to swear in the police officer and another witness who was present in Appellant's courtroom. N.T., 6/1/11, at 617–620. The defendant became very upset, arguing that it was unfair and that he had a right to present witnesses. Appellant told the defendant to stop talking, and when he continued to talk, she told him that she was going to interrupt him to see how he liked it. Appellant then began to say "Rover has a bone, Rover has a bone" over and over again, while looking at the ceiling and waving her head around. *Id.* at 622–23. Rooney testified that he had security concerns because the defendant was becoming increasingly upset as a result of Appellant's behavior. Rooney further testified that, at the conclusion of the "trial," he called the magisterial district judge's administrator to report the inci-

dent, and prepared a report regarding the same. *Id.* at 625–26.

The Board next presented evidence regarding a landlord/tenant case, *Alcaro v. DeCesare*, in which the tenants, who were suing their landlord for the return of their security deposit, had difficulty serving the landlord because she was avoiding service. At the hearing, the tenant stated he had a voicemail of the landlord's office staff indicating the landlord was "dodging service," at which point Appellant asked him to play the voicemail, over the defense's objection. N.T., 6/1/11, at 692. According to the tenant, after he played the voicemail, Appellant went "ape shit" and began to scream at the tenant, telling him he was wasting her time. *Id.* at 693. Although judgment was entered in his favor, the tenant testified "I have been to court a number of times … and I never left a courtroom feeling worse than I did the day I won in Judge Merlo's [c]ourt." Id. at 699.

In another case, *Commonwealth v. Steinbrecher*, the incarcerated defendant had a mental health and/or substance abuse problem. The defendant's attorney reached an agreement with the district attorney that his client would waive his preliminary hearing and make a motion for modification of bail so that he could be admitted to an unsecured inpatient treatment facility. According to the defendant's attorney, when he presented the motion to Appellant, she "went off into a tirade" and said to the defendant "you're a low life and now you want bail, and I'm not going to grant you bail unless you tell me that you're a scum bag." N.T., 6/2/11, at 843.

The Board also introduced the testimony of Bethany Zampogna, a chief deputy district attorney, who appeared before Appellant for a preliminary hearing. The prosecuting witness had not been notified and thus failed to appear, and the hearing was continued. The defendant sought a reduction in bail, at which time Zampogna and Appellant began to argue about the amount of bail. Zampogna testified that Appellant told her to "shut up" and then fined her $100 for contempt of

court.[10] N.T., 6/1/11, at 586. Zampogna immediately reported the incident to her boss; Appellant took no action to enforce any contempt order. The Board also presented testimony from Appellant's office staff, who stated that Appellant was rude to them and frequently ridiculed them in public.

## II. Conclusions of the Court of Judicial Discipline

Based on the evidence presented by the Board at trial, the CJD reached the following conclusions of law. With regard to Appellant's work habits, the CJD concluded her practice of repeatedly calling off and consistently arriving late constituted a violation of MDJ Rule 4C, and that her conduct was "so extreme as to bring the judicial office into disrepute," constituting a violation of Pa. Const. art. V, § 18(d)(1). *In re Merlo*, 34 A.3d at 957. The CJD further determined Appellant's repeated absences, repeated continuances, and failure to dispose of truancy cases and sign paperwork in a timely manner demonstrated that she did not devote the time necessary for the prompt and proper disposition of the business of her office, in violation of MDJ Rule 3A, and that she neglected and failed to perform the duties of her office, again in violation of Pa. Const. art. V, § 18(d)(1). Finally, the CJD concluded Appellant's conduct violated the mandate of MDJ Rule 5A that a magisterial district judge diligently discharge her administrative duties and facilitate the performance of the administrative responsibilities of her staff, noting that Appellant's conduct actually interfered with, rather than facilitated, her staff's performance of their responsibilities.

Regarding Appellant's treatment of truancy cases, the CJD opined that Appellant's delayed adjudications "caused a serious problem for the school district because in these cases the students who were already truant, had been cited for their truancy, elected not to show up for court and suffered no consequences, would continue to be truant until sentence was imposed." 34 A.3d at 960. The CJD found such conduct

**10.** Magisterial district judges do not have authority to hold counsel in contempt or impose penalties therefor. *See* 42 Pa.C.S.A. § 4137.

constituted neglect and a failure to perform her duties in violation of MDJ Rule 3A and Pa. Const. art. V, § 18(d)(1).

With regard to Appellant's conduct in the landlord/tenant cases, although the Board alleged her conduct violated four separate rules of conduct and constitutional precepts, the CJD addressed only the alleged violation of MDJ Rule 4A, noting that the remainder, if proven, would be merely cumulative. The CJD held "it is beyond reasonable dispute" that the Board established a violation of MDJ Rule 4A by clear and convincing evidence, and elaborated:

> We are not convinced that [Appellant] is not competent in the law; but we are convinced that she was not faithful to it. The law—Rule 512—requires her to hold hearings in landlord/tenant cases where recovery of possession of real property is an issue; but she didn't hold hearings.

34 A.3d at 964 (footnotes omitted). The CJD suggested that Appellant's "short-cut procedures [were] the obvious product of [her] absenteeism." *Id.*

Finally, with regard to the Board's allegations as to Appellant's demeanor and abuse of power, the CJD concluded that, in the six cases discussed above, the Board established by clear and convincing evidence that Appellant's conduct during the course of the hearings violated MDJ Rule 4C. The CJD declined to address the Board's claim that the same conduct violated five additional rules and constitutional provisions on the basis that, if proven, the charges would be cumulative.

After determining there was clear and convincing evidence that Appellant violated MDJ Rules 3A, 4A, 4C, and 5A, and Pa. Const. art. V, § 18(d)(1), a hearing was held before the CJD to determine the appropriate sanction. Following the hearing, at which Merlo presented a number of character witnesses, the CJD entered an order removing her as a magisterial district judge, and prohibiting her from holding any judicial office in the Commonwealth in the future. On October 21, 2011, Merlo filed a notice of appeal of the CJD's decision with this Court. On January 13, 2012, Merlo filed an

14

application for oral argument; this Court granted the application, and argument was presented on September 11, 2012.

## III. Discussion

 Pursuant to Article V, § 18 of the Pennsylvania Constitution, the Judicial Conduct Board is responsible for investigating and filing charges against judicial officers accused of judicial misconduct. *See In re Berkhimer,* 593 Pa. 366, 930 A.2d 1255, 1258 (2007). Judicial conduct proceedings are considered quasi-criminal in nature, and, therefore, the defendant is afforded the same constitutional rights as are criminal defendants. *Id.* At trial before the CJD, the Board must prove the charges by clear and convincing evidence, and, "[i]n considering whether the evidence presented is clear and convincing, the court must find the witnesses to be credible, and the facts and details to be distinctly remembered. . . . The witnesses' testimony must be sufficiently clear, direct, weighty, and convincing." *Id.*

This Court's review of a decision by the CJD is governed by our Constitution:

> On appeal, the Supreme Court or special tribunal shall review the record of the proceedings of the court as follows: on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and, as to sanctions, the scope of review is whether the sanctions imposed were lawful. The Supreme Court or special tribunal may revise or reject an order of the court upon a determination that the order did not sustain this standard of review; otherwise, the Supreme Court or special tribunal shall affirm the order of the court.

Pa. Const. art. V, § 18(c)(2); *In re Berkhimer,* 930 A.2d at 1258.

Where the CJD has imposed sanctions upon a judicial officer, this Court's review is limited to a determination of whether those sanctions are lawful; we may not re-weigh the sanctions against the aggravating or mitigating circumstances. Pa. Const. art. V, § 18(c)(2); *Berkhimer,* 930 A.2d at 1259. We note, however, that

The Pennsylvania Constitution provides that this Court "shall exercise general supervisory and administrative authority over all the courts. . . ." Pa. Const. art. V, § 10(a). This is a broad authority. This Court is entrusted with safeguarding the integrity of the judicial system; even the appearance of judicial impropriety can be cause for exercise of our King's Bench jurisdiction.

*In re Merlo*, 609 Pa. 598, 602, 17 A.3d 869, 871 (2011).

## A. Violations of Section 18(d)(1)

In her brief to this Court, Appellant first argues the CJD erred in holding that, as a result of her conduct, she brought her judicial office into disrepute in violation of Section 18(d)(1). Appellant emphasizes that her first argument focuses only on whether her conduct brought her judicial office into disrepute under Section 18(d)(1), and not whether she violated Section 18(d)(1) by neglecting her judicial duties, which she addresses in a separate argument. *See* Appellant's Brief at 20. Appellant complains that "[t]he disrepute finding is particularly serious" because, pursuant to Article V, § 16 of the Pennsylvania Constitution, if a judge is suspended or removed on this basis, he or she loses their salary and pension benefits. Appellant's Brief at 21. Although she admits that she was excessively absent during periods of 2008 and 2009, Appellant asserts that her absences in 2009 were "mitigated" due to the fact she was running for reelection at that time. She further asserts that she asked for coverage on these occasions, but was denied coverage, and that she "changed her practice in 2010." *Id.* at 26.

In support of her argument that her conduct did not rise to the level of violating Section 18(d)(1), she cites several cases in which the CJD did not conclude that a judicial officer's conduct brought the office into disrepute. *See* Appellant's Brief at 21–23 (citing *In re Smith*, 687 A.2d 1229 (Pa.Ct.Jud. Disc.1996) (common pleas court judge's failure to render timely decisions in 61 pending cases did not bring judicial office into disrepute); *In re Daghir*, 657 A.2d 1032 (Pa.Ct.Jud.Disc. 1995) (judge who accepted football tickets from a person with

a matter of financial interest pending before the judge, and unreasonably delayed deciding six cases, warranted only a reprimand and a seven-day suspension without pay); *In re Brown,* 907 A.2d 684 (Pa.Ct.Jud.Disc.2006) (magisterial district judge who sexually harassed female employees and made racial statements over period of more than ten years not found to have brought his judicial office into disrepute)).

Appellant further emphasizes that, unlike the instant matter, in many cases where the CJD concluded that a judicial officer's conduct brought the office into disrepute, the judicial officers were alleged to have committed criminal acts. Appellant's Brief at 22 (citing *In re Hamilton,* 932 A.2d 1030 (Pa.Ct.Jud.Disc.2007) (magisterial district judge threatened an off-duty police officer during a party at a local golf club and then physically assaulted the officer and verbally abused the officer's wife); *In re Kelly,* 757 A.2d 456 (Pa.Ct.Jud.Disc.2000) (magisterial district judge requested favorable treatment for a friend from another magisterial district judge in connection with a traffic violation); *In re Harrington,* 877 A.2d 570 (Pa.Ct.Jud.Disc.2005) (on a number of occasions during a two-week period, magisterial district judge parked her car at expired meters and placed on her windshield parking tickets that had been issued to others for overtime parking)).

Finally, Appellant acknowledges the CJD's decision in *In re Lokuta,* 964 A.2d 988 (Pa.Ct.Jud.Disc.2008), *aff'd* 608 Pa. 223, 11 A.3d 427 (2011), but contends "Lokuta is a very different case where there were massive findings of misconduct on multiple cases and where there was no acceptance of any responsibility." Appellant's Brief at 24. In *Lokuta,* the Board charged a common pleas court judge with failing to be courteous with others while acting in her official capacity; engaging in conduct that brought her judicial office into disrepute; failing to promptly dispose of the court's business; failing to conduct herself at all times in a manner promoting confidence in the judiciary; failing to disqualify herself in a proceeding in which her impartiality may be questioned; and engaging in conduct prejudicing the proper administration of justice. The CJD found the Board proved all charges by clear

and convincing evidence, and ordered that Lokuta be removed from judicial office and prohibited from holding any judicial office in the future. Appellant suggests that, although *Lokuta* and the instant case "appear very similar," they are not because, *inter alia,* "[Appellant] accepted responsibility on some matters" and her case "does not approach the magnitude of the *Lokuta* violations and misconduct." *Id.* at 25.

■ As this Court explained in *Berkhimer,* the CJD has defined "disrepute" as "necessarily incorporat[ing] some standard with regard to the reasonable expectations of the public of a judicial officer's conduct." 593 Pa. at 372, 930 A.2d at 1258. Moreover, "[w]hether particular conduct brings the judicial office into disrepute is determined on a case-by-case basis." *Id.* As the CJD noted in *In re Berry:*

> It is fair to say that the difficulty in deciding these cases has not been in determining whether the conduct is "bad" or "reprehensible" or whether it makes the particular judge "look bad"; the difficulty has been in determining whether the conduct of the particular judge makes *everybody* "look bad," whether it makes judges *collectively* "look bad," whether the conduct gives *all* judges a "bad name"—whether it is such that brings the office itself into disrepute.

979 A.2d 991, 998 (Pa.Ct.Jud.Disc.2009) (emphasis original).

In considering whether Appellant's conduct brought the judicial office into disrepute, the CJD reflected extensively on its findings in *Lokuta:*

> [Lokuta's] custom of arriving 15, 20 minutes, or a half hour or an hour late for scheduled court sessions is the quintessential discourtesy to litigants, jurors, witnesses and lawyers. When it is commonplace, as here, it takes on the character of arrogance and disrespect for the judicial system itself, as well, of course, disrespect for those who, bidden by the court to be in court at a time chosen by the court, wait, sometimes in a "packed courtroom," for the arrival of the judge.

\* \* \*

These considerations lead us to a contemporaneous finding that this conduct is such that brings the judicial office into disrepute which subjects [Lokuta] to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

\* \* \*

We note that for most of the occupants of the benches in [Lokuta's] courtroom—the litigants, the jurors and the witnesses—this is a once-in-a-lifetime experience, their only exposure to the judicial system; and what they take away will be based largely, if not predominantly, on the conduct of the judge.

\* \* \*

Certainly the reasonable expectations of the public would include the expectation that the judicial officer act with the same respect for the court as those members of the public did by obeying the court's scheduling order; would include the expectation that the judicial officer would act with consideration for the time and schedules of the hard-working people who crowd her courtroom; and would include the expectation that a judicial officer would conduct herself with the same deference and consideration for others as is taught in the schools and in the homes of [the] [c]ounty. [Lokuta's] conduct described in this record is the kind of conduct which gives the judicial office itself and courts in general a "bad name."

We conclude that the conduct of [Lokuta] was so extreme as to bring the judicial office into disrepute.

*In re Merlo*, 34 A.3d at 956–57 (quoting *Lokuta*, 964 A.2d at 1005–06).

With respect to the instant case, the CJD stated:

We conclude, as we did in *Lokuta*, that the conduct of [Appellant] was so extreme as to bring the judicial office into disrepute.

We are obligated to mention ... that while we described Lokuta's conduct as "egregious," [Appellant's] practice of "calling off" was *beyond egregious*. When one is first presented with the testimony set out above that [Appellant]

"called off" at 10, 10:30, even as late as 11 a.m. all the while knowing that she had a list of as many as 30 hearings scheduled to begin at 9:30 a.m., all the while knowing that her waiting room was crowded with citizens in need of her court and by others who had been summoned there by her, and all the while knowing the serious inconvenience and extra burden she was placing on her staff, and then, when one is presented with Board Exhibit 1 and all its documentation that [Appellant] did this day after day, week after week, month after month, year after year, one's inclination is to reject this evidence—it, simply, is hard to believe. But it is true: the witnesses are all quite credible—their testimony is unchallenged; Board Exhibit 1 is extremely well documented—and [Appellant] stipulates as to its truth and accuracy. Our evaluation of this record is further influenced by the emphatic testimony of former President Judge Platt and Court Administrator Roberts that [Appellant] was totally unamenable to their corrective efforts. Moreover, [Appellant's] partial explanation—that she did not take vacation—not only fails to address the issue of inconvenience to scheduled litigants, but is also belied by the evidence showing that she did take vacation. We are left, then, with a judicial officer who is at once callous and uncaring, oblivious and incurious of the consequences of her conduct— conduct which was unchecked even by written warnings and admonitions from the magisterial district court administrator and from her president judge.

This is not to mention that on the days when [Appellant] *did* come to work, she was *never* at work on time—she was *always* late.... We find that this conduct, by itself constitutes a violation of Rule 4C. and of Article V, § 18(d)(1) of the Constitution as conduct which brings the judicial office into disrepute.

*In re Merlo*, 34 A.3d at 957–958 (emphasis original, footnotes omitted).

Although Appellant cites several cases in which a judicial officer's conduct was determined *not* to have brought the office into disrepute, as noted above, a finding of disrepute

must be made on a case-by-case basis, and the cases cited by Appellant are factually distinct from the instant case. For example, in *Smith*, it was stipulated that the trial judge did not act with a malicious intent with regard to the rights of litigants in failing to render prompt decisions. 687 A.2d at 1232. In *Daghir*, the defendant was not charged with violating Section 18(d)(1). Finally, in *Brown*, the Board withdrew the charges alleging violations of Section 18(d)(1).

 Furthermore, while Appellant notes that several cases in which the CJD found that a judicial officer's conduct brought the office into disrepute involved criminal conduct, criminal culpability is not a precursor to a finding of disrepute. For example, in *Berkhimer, supra*, a magisterial district judge who subjected his female employees to expletive-filled language, and offensive, embarrassing and inappropriate comments, both in public and in private, on a daily basis, was found to have brought his judicial office into disrepute in violation of Section 18(d)(1). In *In re Zoller*, a magisterial district judge who used profanity, threw his pen down on the bench, and behaved in an angry, agitated, loud, and confrontational manner during a single arraignment was found to have brought his judicial office into disrepute in violation of Section 18(d)(1). 792 A.2d 34, 38–39 (Pa.Ct.Jud.Disc.2001) ("We believe that it is beyond dispute or debate that the expectations of the public include the expectation that the business of its government's judicial system will be conducted in a place where dignity and grace are not strangers and where ordinary good manners are not excluded."). Thus, the fact that Appellant's conduct was not criminal in nature does not preclude a determination that her conduct brought her office into disrepute. A finding that a judge has engaged in offensive, confrontational, or discourteous conduct on the bench may also support a violation of Section 18(d)(1).

 In concluding Appellant's conduct brought her judicial office into disrepute, the CJD thoroughly recounted all of the evidence presented by the Board, and found the witnesses' testimony to be credible, clear, direct, weighty, and convinc-

ing—indeed, in many cases, unchallenged. Moreover, notwithstanding Appellant's protestations to the contrary, the factual similarities between her case and the *Lokuta* case, particularly with respect to the judges' chronic tardiness on the bench, are substantial. Finally, Appellant's conduct concerning the truancy matters is some of the most troublesome. As we noted in *Lokuta*, for most individuals, their appearance in magisterial district court may be their first, if not only, exposure to the legal system, and the conduct of the judge will substantially impact their view of the judiciary as a whole. This is especially true for juveniles scheduled to appear for truancy hearings. It is beyond hypocritical for a judge who repeatedly fails to appear, or consistently appears late, for scheduled court proceedings to lecture and impose sanctions upon a juvenile who is appearing before the judge due to truancy issues. Such conduct undermines the very purpose of the proceedings and makes a mockery of the judicial system.

In light of the evidence presented by the Board, we discern no error in the CJD's determination that Appellant's conduct brought her office into disrepute, in violation of art. V, § 18(d)(1).

## B. Sanctions

Appellant next argues the CJD erred in ordering she be permanently barred from holding judicial office. She notes that "[a] number of witnesses appeared in person in support of [her] contention that she should not be permanently removed, but only suspended based on the [CJD's] findings of violation." Appellant's Brief at 26–27. In her brief, Appellant recounts the testimony of these witnesses, most of whom testified that Appellant had an excellent reputation as a peaceful and law abiding citizen, and some of whom testified that she had expressed remorse and accepted responsibility for her improper conduct. Appellant also testified on her own behalf, conceding that her actions were "wrong," and stating that she had learned from her mistakes, but reiterating that she had requested coverage for the times she called off. Appellant also

asserts that her caseload had nearly tripled between the time she was elected in 2004 and 2009.

Appellant further offers that she has no prior history of discipline, and avers that, despite the fact that the president judge began receiving complaints in 2005, she was never advised of the complaints or given an opportunity to correct her conduct before the complaints were ".dumped to the Judicial Conduct Board":

> Although there are a number of complaints, it has to be put in the context that it is not Ms. Merlo's fault that Court Administration held these complaints for a number of years. The delay before reporting should be treated as mitigation. If these complaints had been brought to her attention, they could have been resolved, particularly in reference to the landlord/tenant matters and/or Ms. Merlo could have corrected her behavior earlier, as she did in 2010. There was no reason to collect numerous complaints on uncontested landlord/tenant complaints, but not tell the judge she must have hearings. Further, if the Court system had brought the concerns of the absenteeism, particularly in 2009, there could have been adjustments then. Ms. Merlo repeatedly asked the Court Administration for a replacement or coverage when she was campaigning, but these requests were denied.

Appellant's Brief at 32, 33.[11]

Finally, Appellant contends the sanction of permanently barring her from holding judicial office is not lawful because it was contrary to the sanctions imposed in other cases, including *In re Cicchetti*, 698 A.2d 704 (Pa.Ct.Jud.Disc.1997) (conduct of common pleas court judge who made persistent sexual

---

**11.** Although Appellant avers that, had she been advised of the complaints regarding her behavior earlier, she would have been able to correct it, Appellant does not suggest that ( ... continued) the Board's allegations were untimely under Pa.Jud.Conduct.Bd.R.P. 15, which precludes the Board's consideration of complaints arising from acts or omissions that occurred more than four years prior to the date of the complaint. However, when the last episode of an alleged pattern of recurring judicial misconduct arises within the four-year period, the Board may consider all prior acts or omissions related to the alleged pattern of conduct.

advances towards a subordinate employee who repeatedly rejected the advances found to have brought judicial office into disrepute and warranted "severe reprimand and censure"); *In re Joyce*, 712 A.2d 847 (Pa.Ct.Jud.Disc.1998) (magisterial district judge who attempted to influence the outcome of traffic cases found to have brought office into dispute and received a reprimand); *In re McCarthy*, 828 A.2d 25 (Pa.Ct.Jud.Disc. 2003) (magisterial district judge who was regularly seen drinking alcohol in his office during work hours and who became aggressive and confrontational found to have brought office into disrepute and was suspended for six months without pay); *In re Toczydlowski*, 853 A.2d 24 (Pa.Ct.Jud.Disc.2004) (magisterial district judge who was placed in ARD for marijuana abuse found to have brought office into disrepute and given public reprimand); *Harrington, supra* (magisterial district judge who put fake parking tickets on her car found to have brought office into disrepute and was barred from holding judicial office for five years); *In re Marraccini*, 908 A.2d 377 (Pa.Ct.Jud.Disc.2006) (magisterial district judge who entered waiting room and called all defendants "morons" found to have brought office into disrepute and was reprimanded); *In re Hamilton*, 932 A.2d 1037 (Pa.Ct.Jud.Disc.2007) (magisterial district judge who became intoxicated and assaulted off-duty police officer found to have brought office into disrepute and suspended for nine months); and *In re Berry, supra,* (common pleas court judge who ran real estate business out of his judicial chambers over a fifteen-year period found to have brought office into disrepute and suspended for four months).

The Board responds that, in making the above arguments, Appellant seeks to have this Court "reweigh the aggravating and mitigating circumstances in the record and impose a different sanction upon her," which this Court is not permitted to do. Brief of JCB at 54.

 To the extent Appellant argues the CJD failed to credit the testimony of her character witnesses, this Court has explained that "[t]he existence of good character evidence does not undo [an appellant's] offensive behavior." *Berkhimer*, 930 A.2d at 1259. Moreover, "[d]isciplinary sanctions focus be-

yond the one who is charged, to the message sent to the public and the effect on the expectation of standards of behavior." *Id.* Disciplinary sanctions are intended to protect the public, maintain the integrity of the legal system, and "repair[ ] the damaged public trust and provide[ ] guidance to other members of the judiciary regarding their conduct." *Id.* at 1260 (citation omitted). Thus, Appellant's attempted justification for her behavior, and her expressions of remorse,[12] do not obviate the need or underlying purpose of her disciplinary sanctions.

With regard to Appellant's argument that the sanctions imposed are unlawful because they are greater than those imposed in other cases, we reiterate that, in reviewing the CJD's sanctions against a judicial officer, our review is limited to whether those sanctions are lawful. Pa. Const. art. V, § 18(c)(2); *Lokuta,* 11 A.3d at 449; *see also Berkhimer,* 930 A.2d at 1259 ("the purpose of our review is not to re-weigh the sanction against aggravating or mitigating circumstances, but to determine whether the sanction is lawful"). Furthermore, as we explained in *Lokuta,*

> Similarity of misconduct does not require identicality of sanction, for there are other factors that bear on that decision, including mitigating and aggravating considerations and how a particular jurist's misconduct undermines public confidence in the judiciary.

11 A.3d at 450.

The Pennsylvania Constitution, Article V, § 18, sets forth removal as an available sanction for bringing disrepute upon the judicial office. As discussed above, the CJD's determination that Appellant's conduct brought her judicial office into disrepute is supported by clear and credible evidence. Thus, Appellant's removal from the bench is a lawful sanction,

---

12. Although Appellant asserts that she has expressed remorse and accepted responsibility for her actions, she nonetheless continues to place blame for her behavior on other factors, including, *inter alia,* the increase in her workload; the failure of the court to provide coverage for absent judges; and the court administration's failure to advise her sooner of the complaints regarding her behavior.

 

and the fact that others may have received lesser sanctions is not a basis for relief.

## C. Factual Findings

As her third issue, Appellant contends the CJD made erroneous factual findings with respect to her conduct and the extent to which such conduct constituted violations of the MDJ Rules and/or Article V, § 18(d)(1) of the Pennsylvania Constitution. First, she contends the CJD erred in failing to credit the strong character testimony she presented. As noted above, however, good character evidence does not undo Appellant's offensive and improper conduct. *See Berkhimer,* 930 A.2d at 1259.

Appellant further avers the CJD failed to consider the fact that President Judge Platt and his administrative assistant received complaints concerning her conduct beginning in 2005, but failed to file a complaint with the Board until 2009, and failed to communicate the complaints to her so she could change her conduct. She also suggests the CJD erred in failing to recognize her case load quadrupled in her seven years in judicial office and there was no evidence of a substantial backlog. . Once again, however, it is not this Court's function to "re-weigh the sanction against aggravating or mitigating circumstances." *Id.*

Next, Appellant argues the CJD ignored evidence that the school district did not agree with her philosophy on handling truancy matters, and would have preferred that she approve all of the citations. This allegation is belied by the CJD's opinion, wherein the CJD stated: "It did become clear that a portion of the problems between [Appellant] and the school district resulted from the latter's view that a judge's role should be to simply affirm the district's conclusion of truancy. However, this does not alter our evaluation of the objective evidence." *In re Merlo,* 34 A.3d at 962 n. 9. Thus, contrary to Appellant's argument, the CJD did *not* ignore evidence of the philosophical differences regarding the truancy matters; it

simply determined that the evidence did not change its conclusion regarding Appellant's behavior.

In finding that Appellant's excessive absenteeism and habitual tardiness constituted neglect of her judicial duties under Section 18(d)(1), the CJD reasoned: "when the judge is absent from her court with the frequency here established," "when cases are continued over and over again," "when the judge fails to dispose of truancy cases for as many as 116 days," and "when she fails to sign the numerous papers she is required to sign in the ordinary business of her court and permits a large backlog to accumulate," the judge neglects and fails to perform the duties of her office in violation of Section 18(d)(1). 34 A.3d at 958–959. In challenging the CJD's finding in this regard, Appellant contends that she was not habitually late, but rather that it was her published practice to arrive 20 to 40 minutes after the cases were scheduled to allow the parties time to get organized.[13] Regarding her excessive absences, Appellant contends the CJD ignored the fact that most of her call-offs occurred in 2009, while she was "in a very difficult election," Appellant's Brief at 39; that her rate of absenteeism was less in 2008, and improved in 2010; that she testified that she repeatedly tried to obtain coverage for her absences, but "[a]pparently there was a decision by Lehigh County not to spend money if a judge should call off or take days off [which] was not the fault of Ms. Merlo," id. at 40; and that she testified she "was having a problem with her staff putting her vacation schedules on a timely basis," id., such that a vacation day might be marked as a call-off.[14]

13. In this regard, Appellant continues:
 That is not an uncommon practice in Pennsylvania. It is a rare judge who appears at the same time people are subpoenaed to come into Court. If that is going to be the practice in the future, there has to be some warning because most judges do not appear on the bench at the time of the hearing because they wait for ten to thirty minutes until their staff tells them that cases are ready and organized.
 Appellant's Brief at 43.

14. Again, Appellant attempts to shift the blame for her excessive call-offs to someone else; in this instance, she blames her staff.

 Credibility determinations are for the trier of fact. As long as sufficient evidence exists in the record to support the credibility findings, this Court may not overturn those findings. *Lokuta*, 11 A.3d at 445–46. Although Appellant contends it was her practice to arrive late to hearings in order to allow the parties time to get organized, the CJD chose not to believe her testimony that her repeated tardiness was intended to benefit the litigants; rather, the CJD credited the testimony that Appellant did not usually arrive at the court-house until 20 to 40 minutes after a case was called, and that the parties who had been kept waiting in a crowded courtroom often were angry and frustrated.

Additionally, with regard to Appellant's explanation for her excessive absenteeism during 2009, and her opinion that judges should be permitted to campaign during daylight hours because they are elected officials, the CJD explained:

> However strong [Appellant's] opinion on the subject might be, there is only one thing she, as a magisterial district judge, needed to know, and that is that Rule 3A. does not permit campaigning—or anything else—if it is allowed to take priority over "the prompt and proper disposition of the business of her office," which [Appellant's] election cam-paigning certainly did.

34 A.3d at 959. Thus, Appellant's belief that she needed to campaign for reelection during court hours, and her opinion that she was entitled to do so, do not excuse her conduct and do not alter the fact that her conduct violated the MDJ Rules and Section 18(d)(1).[15]

 With regard to the CJD's finding that Appellant violated MDJ Rule 4(A) by failing to conduct hearings in

---

15. The position of magisterial district judge is not an occasional or part-time position. In addition to MDJ Rule 3A, which, as noted above, requires magisterial district judges to devote the time necessary to the prompt disposition of the business of their office, which must take *priority over any other occupation, business, profession, pursuit or activity*, MDJ Rule 103 requires magisterial district judges to establish "a schedule of regular sessions and hours during which his office or offices will be open for the conduct of business." Such schedule must be approved by the president judge of the court of common pleas for the applicable judicial district, and the schedule must be posted.

landlord/tenant matters, Appellant reiterates that no one ever told her that she had to have a hearing for uncontested landlord/tenant matters, she did not realize her conduct was improper, and her violation of the rules was a mistake and not intentional misconduct. However, Pa.R.C.P.M.D.J. 512 clearly requires a magisterial district judge to conduct hearings in actions for the recovery of possession of real property, and it is reasonable to expect a judge to be aware of the applicable rules of procedure.[16] Indeed, as the CJD stated in *In re Davis*, "[h]olding hearings is the prototypical adjudicative function, and, to say the least, it would be awkward to say that a judge who is ignoring the law by not holding hearings is being 'faithful' to it." 954 A.2d 118, 124 (Pa.Ct.Jud.Disc.2007). Thus, in *In re Davis*, the CJD found the judicial officer's failure to hold hearings to determine a defendant's financial ability to pay fines and costs, as required under Pa.R.Crim.P. 456, constituted a violation of MDJ Rule 4A. The CJD further found in *In re Davis* that the judicial officer's conduct in sentencing defendants charged with summary traffic offenses to community service, despite the fact that vehicle code offenses are excluded from alternative adjudication programs, violated the law and constituted a violation of MDJ Rule 4A. Ultimately, Appellant's alleged ignorance of the procedural rules does not excuse her failure to comply with the same, and her failure to do so likewise constitutes a violation of MDJ Rule 4A.

Finally, Appellant contends the CJD erred in finding that she violated MDJ Rule 4C by virtue of her conduct during hearings in the *Krauss, Parrales, Renninger, Alcaro, Steinbrecker,* and *Zampogna* cases. As noted above, credibility

16. Specifically, Pa.R.C.P.M.D.J. Rule 512(a) provides: "[t]he plaintiff must appear at the hearing and present testimony in an action for the recovery of possession of real property." The comment to Rule 512 explains: "Subdivision A of this rule is intended to make clear that the magisterial district judge may not enter a default judgment in a possessory action, including a judgment for money only. The plaintiff must appear and give testimony to prove the complaint even when the defendant fails to appear for the hearing." Pa.R.C.P.M.D.J. Rule 512 cmt. If the plaintiff fails to appear at the hearing, the judge may continue the hearing for cause or dismiss the complaint without prejudice.

determinations are for the finder of fact. The CJD found the Board presented clear and credible evidence of Appellant's conduct at these hearings, and determined that her conduct violated MDJ Rule 4C. There is no basis to conclude the CJD erred in its findings, and, indeed, it is worth noting that, in at least three instances, the CJD concluded that Appellant's conduct did not rise to the level of a violation.

For all of the reasons set forth above, we affirm the decision of the CJD removing Appellant from judicial office and precluding her from holding judicial office in the future. Order Affirmed.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE and Justices SAYLOR, EAKIN, BAER and McCAFFERY join the opinion.